## PIONEER GOLD MINING CO. v. BAKER.

*(Circuit Court, D. California. February 9, 1885.)*

1. MORTGAGE — MINING CORPORATION — CONTRACTS OF DIRECTORS — SHERIFF'S SALE.

    In view of the facts clearly established by the testimony in this case, *held,* that the sheriff's sales set out in the complaint, had and brought about as they were, and the contract made by the directors, were, in effect, a mortgage for the purposes set out in the contract.

2. SAME—PAROL EVIDENCE.

    Equity, to determine whether a written instrument is, in effect, a mortgage, hears parol evidence, not to contradict or vary the terms of the instrument, but to raise an equity superior to it, and give it effect according to the true intent and purpose of the parties.

3. SAME—PERSONAL OBLIGATION OF MORTGAGOR.

    A mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured or attempted to be secured thereby. In the one case the property alone is charged with the lien,— is looked to solely by the mortgagee out of which to make his lien; in the other, he has the additional security of the personal obligation of the mortgagor.

4. SAME—DEBT CHARGEABLE ONLY AGAINST CERTAIN PROPERTY — MEASURE OF SECURITY.

    A debt chargeable only against certain property is, in effect, simply a debt with limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded.

5. SAME—CONDITIONAL SALE OR MORTGAGE.

    In cases of doubt whether a transaction was a conditional sale or a mortgage, equity will hold it to be a mortgage, as by so doing the rights of each party are preserved; the mortgagor is permitted, upon fulfillment of his contract, to save his property, and the mortgagee receives his just dues.

6. SAME—TENDER.

    Under the circumstances of this case, considering the whole transaction as a mortgage, a tender upon the exact day was not strictly necessary to preserve the rights of the parties under the contract.

7. SAME—DECISIONS OF STATE COURT—STATE STATUTE.

    Where, under the statutes of a state, a contract would be considered a mortgage, a United States court, in such state, in carrying such contract into effect, will be guided by the decisions of the supreme court of such state.

In Equity.

*Stewart & Herrin*, for complainant.

*Van Clief & Gear* and *John N. Pomeroy*, for defendant.

SABIN, J. This suit is brought by plaintiff to establish its right to redeem the Pioneer mine, situated in Sierra county, California, from defendant, under an asserted mortgage, alleged to have been created and effected by virtue of certain contracts and sheriff's sales set forth in the complaint. The suit was commenced on the twenty-second day of November, 1883, in the superior court of Sierra county, and was removed to this court for trial. It is difficult to epitomize or abridge the pleadings, and, at the same time, fully and clearly state the case of either party, plaintiff or defendant. I therefore refer to the complaint and answer at large, in this opinion. Plaintiff is the successor in interest to the Pioneer Mining Company, a corporation organized in 1874. It is necessary, *in limine*, to determine the legal effect of the contracts set out in the complaint, executed by Chapman and Baker, and by Chapman and Sayre and Baker. Were they made for the sole use and benefit of Chapman, or Chapman and Sayre, or were they made as and for the benefit of the Pioneer Mining Company? And if made for the sole benefit of Chapman and Sayre, is there any legal objection to their transfer by them to said company, and by said company to plaintiff? The complaint alleges that all of those contracts were made for the use and benefit of said company; that they were assumed and ratified by said company and duly transferred, with all rights of action thereunder, to plaintiff, prior to the commencement of this suit. As to their ratification and adoption by said company, and transfer to plaintiff, the testimony is ample, and the allegations of the complaint in this respect are fully sustained. The answer controverts the allegations of the complaint, now under consideration, and alleges that said contracts were made for the sole use and benefit of Chapman and Sayre, and denies their adoption or ratification by the Pioneer Mining Company, or their transfer by said company to plaintiff. The execution or delivery of Contract B is denied. This contract and its execution will be considered hereafter.

Upon the argument of the demurrer to the complaint, heard in this court, it was held that sufficient appeared upon the face of the complaint to entitle plaintiff to maintain this suit. 20 FED. REP. 4. The demurrer, of course, confessed the allegations of the complaint, and the ruling of the court was predicated upon the matters so pleaded and confessed. Are those allegations sustained by the proofs submitted?

We shall hardly understand and fully appreciate much of the testimony in this case, its value and significance, unless we constantly bear in mind the relations which existed between these parties—Chapman and Sayre, and defendant—from December, 1874, to June, 1883. During all of this time the testimony abundantly shows that their re-

lations were intimate, confidential, and trustful, and involving the expenditure of large sums of money. Prior to 1874, defendant, Baker, was the owner of a portion of the placer mining claims, which now constitute the Pioneer mine. He had been working some of these claims in the years 1872, 1873, and 1874, at a profit; taking out, perhaps, $60,000 in the year 1874. In December, 1874, Baker effected a sale of the Pioner mine to the Pioneer Mining Company, at a valuation of $255,000. He received at the time of sale, in money, $112,-500; the obligations of the company for $125,000 more, payable out of the proceeds of the mine, after $100,000 had been realized therefrom; and 1,600 shares of the stock of the company. The Pioneer Mining Company commenced to develop the property, and carried it on at great expense until some time in the early part of 1876. The expense of opening the mine properly had been far beyond the estimates made at the time of purchase, and the receipts from the mine were probably far less than the company had expected. Fortuitous events had thrown the burden of the expense largely upon Chapman, he owning then three-fourths of the stock of the company.

Chapman, Sayre, and F. W. Hadley constituted the board of trustees of the company from its organization to the present time. Baker was familiar with all of the affairs of the company; knew who were its officers, and the interest which Chapman and Sayre had in the company. He lived near the mine and saw the work thereon as it was being done. He states in his testimony that this work was necessary to open the mine properly, and generally was well done. In 1876 the company was embarrassed for means to carry on its work, and probably discouraged at the results attained. Under these circumstances Contract A was executed, and the company resumed work, and continued it until some time in the year of 1877, when it became again embarrassed, and practically suspended work on the mine during the year. It did but little work in 1878. I am not certain that Baker at this time knew the extent of Hadley's interest in the company. I think he did not. Hadley's interest (100 shares of stock) was so small that it was not considered. Chapman and Sayre then, in 1878, owned all of the stock of the company, except the 100 shares held by Hadley, who was Chapman's clerk, and probably held this stock for the purpose of qualifying him to be a trustee in the company.

The Pioneer Mining Company was capitalized at $640,000, divided into 6,400 shares, of the par value of $100 per share. Chapman was the president of the company; was its controlling spirit, and had furnished by far the greatest portion of money expended on the mine. Baker knew these facts. Chapman and Sayre were considered to be, and virtually were, the Pioneer Mining Company; and all of these so dealt with each other from 1876 to 1883. Contract A was executed formally by the Pioneer Mining Company and Baker; Contract B, (if executed at all,) between Baker and Chapman. The lease of November 1, 1878, to Baker was executed by the Pioneer

Mining Company, formally. The contract of the same date, (Defendant's Exhibit 9,) drawn by defendant's attorney, is executed by Baker and Chapman, and the final agreement of December 20, 1878, drawn by Baker's attorney, is executed by Baker, of the first part, and Chapman and Sayre, of the second part.

It will be seen from these contracts that the parties executed them in various forms, attaching no importance to the mere matter of form, or the persons by whom executed. Each and all of these contracts, so executed, have reference to the property and to the indebtedness of the Pioneer Mining Company in terms, and that property and indebtedness only. Not a word appears in any of them as to any other property or indebtedness, or to any individual property or indebtedness of Chapman, or Chapman and Sayre. And in the correspondence, in evidence, extending from 1878 to 1883, between Baker and Chapman, and Baker and Sayre, Baker makes frequent reference to his desire to work out his claim against the mine and save it for "you,"—for the "old owners," for the "company." These terms are used interchangeably, and without the slightest obscurity as to his meaning. Baker secured important rights by these contracts, as will be seen hereafter. It is not possible that Baker, or his attorney, in drawing these contracts, for a moment considered them as the mere personal contracts of Chapman, or Chapman and Sayre. There was nothing upon which these contracts could act except the property of the Pioneer Mining Company, and nothing upon which they were intended to act except upon that property. There was no obligation resting upon the company to pay to Baker the $125,000, or the $100,000, as agreed upon in Contract A, except as it should be taken from the mine. That payment was a charge, a lien, *in rem*, solely upon the mine. The contract of December 20, 1878, was first drawn by Titus, Baker's attorney, to be executed only by Baker and Chapman. When the contract was shown to Sayre he suggested that he also ought to be a party to it, and it was redrawn accordingly by Titus, and so executed. I have no doubt that if that contract had been drawn to be executed by Baker, as the first party, and the Pioneer Mining Company, as the party of the second part, it would have been just as readily so executed by all of the parties.

In his verified answer to a suit brought by Hadley and Brown, growing out of this contract, in which suit they charged fraud in the execution of this contract, Baker says "he did not realize or think of any difference or conflict of interest between said corporation on the one part, and Chapman and Sayre on the other," and that "at the time of signing said agreement he would just as readily and willingly have signed a like agreement with said corporation, had he been requested to do so by said Chapman and Sayre." I have no doubt it was a mere inadvertence that it was not so drawn, instead of being drawn in the form as executed. I am aware of the danger

in attempting to explain contracts long after their execution. I think no such danger is to be feared in this case. The various contracts set out in the complaint must be considered together. They are interdependent, and have but one object and purpose running through them all, to-wit, the payment of the indebtedness of the Pioneer Mining Company, therein mentioned, in the manner and within the time therein specified, and then to surrender the property to its lawful owners. Baker was not making, nor was his attorney draughting for him, mere barren, idle contracts, to be executed by Chapman, or by Chapman and Sayre, which could be of no use to him,—which could give him no substantial rights. These contracts having reference only to the property and indebtedness of the Pioneer Mining Company, reciting in terms that it was the property of that company, were executed by Baker with Chapman, and with Chapman and Sayre, because he knew they were trustees of that company—were a majority thereof—and owned in 1878, as the answer admits, forty-seven forty-eighths of the capital stock of the company. They were carried into effect as though they were the contracts of the company, and Baker at all times derived the same advantage and benefit from them that he would or could have obtained under them had they been formally executed by the company, instead of being executed as they were.

The objects sought and the results attained were the same, in whatever form the contracts were executed. There is no charge of fraud in this case against any of the parties, in reference to the execution of any of these contracts; and the testimony raises no suspicion of fraud in the execution thereof. I doubt not they were executed in the utmost good faith by all of the parties thereto, and the testimony submitted establishes, beyond question or doubt, the fact that these contracts, whether signed by Chapman, or by Chapman and Sayre, were made on behalf of the Pioneer Mining Company, which they then represented and now represent, and were so intended at the time of their execution; and as such they were so considered and carried into effect by all of the parties thereto. Give these contracts this force and effect, and they are clear and unambiguous, and the subsequent conduct and action of these parties, Baker, and Chapman and Sayre, extending through five years and involving outlays of many thousands of dollars, is intelligible, reasonable, and logical. Considered as the mere personal contracts of Chapman, or Chapman and Sayre, and it is impossible to explain or understand them, or their object, or the subsequent action of the parties under them. Baker certainly cannot now complain of this construction being placed upon these contracts, after having enjoyed all of the benefits derivable therefrom during all of this time, while they were by him and all parties actually carried into effect as the contracts of the Pioneer Mining Company.

If recovery can be had in this suit as prayed for, it is immaterial

to Baker whether it be had by plaintiff, by the Pioneer Mining Company, or by Chapman and Sayre. The effect, as to him, is the same in any event. But were these contracts, any and all, the mere personal contracts of Chapman, or Chapman and Sayre, is there any legal objection why they might not transfer them to the company which they then represented, and now represent, whose property, in terms, these contracts solely dealt with, and for whose benefit they were made? I am not aware of any such legal objection. Nothing in any of the contracts forbids such action on their part; and the company which they represented might assume, ratify, and adopt them, if deemed advisable to do so.

Under the pleadings and testimony in this case, it is clear, upon the most familiar principles of law, that the Pioneer Mining Company could compel, if desirable, the transfer by Chapman and Sayre of these contracts to itself, made by its trustees, and dealing solely with its property, and could compel them to account scrupulously for all gains by them derived thereby. Clearly, Chapman and Sayre may do voluntarily what the law would compel them to do upon suit brought for that purpose. They are forever estopped under the record in this case from asserting any personal rights under those contracts, unless they shall first be retransferred to them by the plaintiff in this action.

As already observed, the evidence shows that these contracts were adopted, assumed, and ratified by the Pioneer Mining Company, and by it transferred to plaintiff. I may observe that I do not doubt the legal capacity of Chapman, Sayre, and Hadley to act as the trustees of the Pioneer Mining Company. They were its first duly-constituted trustees. No others have ever succeeded them; and it is not shown that any escheat or forfeiture of its corporate rights and franchises has ever arisen or been declared against that company. It may be further observed that the action of the board of trustees of said company, in assuming and ratifying these contracts, was duly ratified and approved by all of the stockholders of said company, prior to the commencement of this suit. There can be no doubt as to plaintiff's right of action.

A large amount of testimony is submitted in regard to the execution of Contract B, and this testimony is somewhat conflicting. The preponderance of evidence is that this contract was executed and delivered on about the ninth or tenth of August, 1878. In 1877 the Pioneer Mining Company had become embarrassed. The Bank of La Porte had obtained a judgment against the company, November 10, 1877, for about $4,777; and on April 15, 1878, the California Powder Works recovered a judgment against the company for $16,-522.85. There was other outstanding indebtedness of the company, estimated at from eight to ten thousand dollars. Baker also held his claim against the mine for $100,000 under Contract A. Baker, naturally, was solicitous about his claim, and more so as these judg-

ments were a lien upon the mine, and the other indebtedness of the company might at any time be put into judgment. Baker conferred with Daniel Titus, his attorney, in regard to his contract, A, with the company. He was anxious, if possible, to secure a lien on the mine which would take precedence of the two judgments above mentioned. It is evident that he and Chapman often conferred on this subject.

In the purchase of the Pioneer mine, and in developing the same, the Pioneer Mining Company had expended probably $250,000,—perhaps more. Chapman had borne the greater part of the expense of developing the mine. He then, August, 1878, owned three-fourths of the stock of the company. Baker was fully aware of Chapman's heavy investments in the mine, and their personal relations were harmonious; and both were anxious to save themselves from loss, and to aid each other. On the twelfth day of August, 1878, Baker commenced a suit to foreclose Contract A. Titus testifies that he had the subject of bringing this suit under consideration for some months before it was brought; that he had a good deal of anxiety about it, and especially as to whether or not the suit could be maintained; and that he had no knowledge that it would not be defended. Such anxiety would be very natural on his part, considering the contract, and the judgment sought and obtained. The suit was brought, was not defended, and judgment for $102,610 obtained, with interest at 7 per cent. per annum, and the same adjudged to be a lien on the mine, sale ordered, and a personal judgment decreed against the company for any deficiency arising on sale of the property. Prior to the commencement of this suit, John C. Hall had been the attorney of Chapman in sundry matters, not connected with this suit. At his request, Hall prepared the original draught of Contract B for Chapman. It was submitted to Titus, as Baker's attorney, for examination and correction, if desired. Titus examined it, changed it in several respects, and it was returned to Hall for engrossment, as corrected by Titus. It was so engrossed, as changed and amended by Titus, and as it now appears in the complaint. In the original draught, Hall, under a misapprehension, recited the fact that Baker *had* obtained a judgment, etc. As amended by Titus, it reads as we have it in the complaint: that Baker has a claim, etc., and is *about* to obtain judgment, etc.

In his direct examination, Titus is positive that this contract was not executed until after he had obtained this judgment for Baker, August 26, 1878, and that he would not have permitted Baker to execute the same as it now appears in the complaint, because it would have contained a false recital, to-wit, that he was "*about* to obtain a judgment," when in fact he had already obtained the judgment. But on cross-examination he admits that some of the changes suggested by him, as they appear on the slip now attached to the draught of this contract, are in his own handwriting, and, as before stated, this contract is set out in the complaint as it was corrected by Titus. I do

not think that he wrote any "false recital" to be engrossed into the contract.    He, as Baker's attorney, wrote or suggested the recital that Baker "was about to obtain judgment," etc., and this would clearly have been false were not the contract to have been executed prior to the date of obtaining the judgment for Baker.    If the contract was not intended to be, and was not in fact, executed by Baker until October 30, 1878, nearly three months from the time it was first draughted, it is certain that Titus then permitted him to sign it, containing a false recital of an important matter, and that Titus knew that such recital was false.    Now I do not think that Titus did any such thing.    Six years had elapsed from the date of that contract to the time when his testimony thereon was taken.    I think he was mistaken in his recollection of the matter.    August 9th, Hall charges Chapman $50 for drawing this contract, and saw it no more thereafter.    His account-book, containing this charge, was submitted to and examined by the court.    The entry seems to be regular in all respects, and above suspicion.    The testimony of Titus and Chapman as to the date of execution of this contract is conflicting.    I cannot but think that, considering the deep interest which Chapman had in this matter, his recollection is the clearest and most accurate.    From all of the testimony, I have little, if any, doubt that this contract was executed prior to August 13, 1878, the date of the commencement of Baker's suit on Contract A.    But, whatever the fact may be on this point, it is morally certain that Baker and Chapman had a perfect understanding and agreement as to Baker's suit, and that no defense thereto would be made by the Pioneer Mining Company.    Chapman's investment and interest in the mine at that time was nearly equal to, and perhaps greater than, the amount due Baker under Contract A. They wanted further time to make the money from the mine to pay these judgments and other debts, if possible.    They had a common interest in the property, and they labored for a common object and result.    If, as alleged in the answer, Contract B was never executed, it is most singular that Baker and Chapman, by mere accident and unwittingly, should have carried it into full and complete effect, of which there is no dispute, and should also have so fully embodied many of its important provisions into the contract of December 20th, following.    These things could not have occurred by accident or chance; they did not so occur in this case.

I may have given this contract greater attention than its merits demand, as it is supplemented by the contract of November 1, 1878, (Defendant's Exhibit 9,) and is finally merged in the agreement of December 20th, following.    I cannot think that these parties executed Contract B on the thirtieth of October, and only two days thereafter executed the contract of November 1, (Defendant's Exhibit 9.)    On the twelfth of October, 1878, Baker entered into the contract with Baird and the California Powder Works, set out in the complaint. The objects of that contract are apparent.    It gave precedence to the

judgment of the Bank of La Porte, then held by Baird, and to the judgment held by the California Powder Works. Sheriff's sales were to be made on those judgments, and also upon the Baker judgment; the legal title to the mine was to vest ultimately in Baker, and he was given 30 months from the date of obtaining title within which to pay off the two first-named judgments. These sheriff's sales were made accordingly, Baird bidding in the mine for the amount due on the first two judgments, and Baker bidding it in at $60,000, on sheriff's sale a few days thereafter on his judgment. The sheriff's costs and commissions on the Baker sale amounted to about $3,000. This sum Baker could not conveniently raise, and he settled with the sheriff for his costs, waived the sale, and took no certificate of sale from the sheriff on his judgment. This led to a modification of this contract, executed October 25th, as appears in the complaint. By this modification Baker was to assign his judgment to Baird, and the title was to be placed in Titus, who was to join with Baker in a mortgage on the mine to secure the payment of Baker's note for the amount due the California Powder Works, payable 30 months from date. These contracts were carried into effect when the title became vested in Titus, in April, 1879.

When Baker's note became due he was unable to pay it, and he naturally went to Chapman for aid. Chapman then advanced $10,-000 of his own money, paid it on Baker's note, and obtained an extension of one year on the balance. When this extension of time had expired, Baker was still unable to make any payment upon his note. He then, with the written consent of Chapman, mortgaged the mine to Morgan & Donahue, and Chapman took the money so obtained and paid the balance due the California Powder Works. There was a surplus of some $1,400 in Chapman's hands of the money received from Morgan & Donahue, after paying the balance due the California Powder Works. This surplus Chapman retained, to apply on his advance of $10,000, which is all that has been repaid to him on said advance.

After the clean-up of the mine for the season of 1883, Baker paid Morgan and Donahue the amount borrowed from them. It is insisted by defendant's attorneys that this Baker judgment was and is wholly void, and was of no advantage to Baker. I shall not discuss this point. It is sufficient that it served its purpose; and that it did prove advantageous to Baker, and Chapman and Sayre, there can be question. Its ultimate result was to gain for them, by means of the contract of October 12, 1878, more than three years' time within which to pay off the amounts due the California Powder Works, during which time Baker had the continuous and undisturbed possession of the mine; and the holders of the eight or ten thousand dollars of claims and demands against the Pioneer Mining Company, probably seeing no hope of realizing on their claims, forebore pressing the same against the company, with the exception of Ah Leen, mentioned in the com-

plaint. Baker states that he promised to pay this floating indebtedness, but has not done so. It is evident that Baker and his attorney, Mr. Titus, did not consider the judgment as void, nor did Chapman so consider it. Mr. Greathouse, the attorney for the California Powder Works at the time this judgment was rendered, had no doubt that it was collusively obtained. And he so charged Baker and Chapman, who appear not to have admitted the charge and yet not to have denied it. Chapman, however, insisted that no wrong was intended; that the California Powder Works would be fully paid; that he had made arrangements with Baker to that end. Chapman was the man to whom Greathouse principally looked for payment of these demands. He had guarantied their payment. Mr. Greathouse says that finally he consented to make the claims out of the property, and the contract of October 12th was accordingly executed. Chapman's active controlling influence and agency in procuring the execution of this contract cannot be doubted. The testimony of Mr. Greathouse puts this beyond question, and need not be reviewed. And the same is true of the contract made October 25th, modifying the one of October 12th.

Greathouse says that Baker and Chapman both asked him to permit the substitution of Titus in place of Baker, as the person to whom Baird should deed the mine, and that he consented thereto. Titus confirms this in his testimony. He says that Baker and Chapman both came to him and asked him to consent that the property be deeded to him by Baird, and that he so consented; that he did not remember that they assigned any reason, beyond their wish, for the change. It is needless now to inquire what that reason was. Baker and Chapman differ in their testimony on this point. March 26, 1880, Baker, in a letter to Chapman, says, "I would have held the deed myself if allowed." Again, on the twenty-seventh of the same month, he writes Chapman: "You must not forget that your objections, and fear to trust me to carry out this programme, produced the necessity to put it, the legal title to the mine, in other hands, where we could not control the situation." The controlling agency of Chapman in all these matters is too apparent to be denied. The contract of November 1, 1878, (Defendant's Exhibit 9,) executed by Baker and Chapman, followed. It is a supplement to Contract B, having the same general purpose and object, and is merged in the final contract of December 20th. On November 1st was executed the lease giving Baker possession of the mine for six months thereafter. On December 20, 1878, was executed the contract, called in the complaint the final or mortgage contract. Its object is apparent. It was to secure to Baker the payment of the sums therein mentioned and provided for, in the manner and within the time therein specified, and when this was accomplished to surrender the mine to its lawful owners. This and the other contracts set forth in the complaint had this one purpose. All tended to the same result. They dealt only with the property of the Pioneer

Mining Company,—could act on nothing else; sought only to discharge its debts and obligations as therein provided; were executed by Baker with Chapman, and with Chapman and Sayre, because they were the trustees of that company, and because Baker knew them to be such trustees; because he knew they owned nearly all of the stock of that company, and had always been the sole managers of its affairs. And from the dates of the several contracts to June, 1883, they were treated, considered, and acted upon by all parties thereto as the contracts of that company for its use and benefit, and not as the individual contracts merely of Chapman, or Chapman and Sayre. If this be not so, how has it occurred that Baker has had the undisturbed possession of this mine from November 1, 1878, to July 1, 1883? His only formal lease with the Pioneer Mining Company gave him possession of the mine for six months only, from November 1, 1878. Did he continue in possession under that lease, or under the contract of December 20th? If under the latter, then clearly it was treated and considered by all parties thereto as the contract of the company. The lease provided nothing about Baker's keeping accurate accounts of his expenses upon and receipts from the mine, and rendering such accounts to Chapman and Sayre. The contract of December 20th did so provide, and Baker, in his answer, alleges that he always has kept such accounts, and rendered them to Chapman and Sayre.

In view of the facts clearly established by the testimony, I cannot but hold that these sheriff's sales set out in the complaint, had and brought about as they were, and this final contract of December 20th, 1878, were and are in effect a mortgage—no more and no less—for the purposes set out in that contract. It will be conceded that a mortgage may be created in many ways. We are to consider, not so much the means used to that end, as we are to consider the legal effect,—the purpose and intention of the parties in the use of those means.

Equity often looks beyond the mere written instrument, hears parol evidence in regard to the same, not to contradict or vary its terms, but to raise an equity superior to it, and to give it effect according to the true intent and purpose of the parties. And a mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured, or attempted to be secured, thereby. In the one case the property alone is charged with the lien, —is looked to solely by the mortgagee out of which to make his lien; in the other, he has the additional security of the personal obligation of the mortgagor. A debt chargeable only against certain property is, in effect, simply a debt with limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded. And this is exactly the security taken by Baker in 1874, when he sold this mine for the balance of the purchase money, $125,000. This arrangement was then sat-

isfactory to Baker,—was his voluntary contract,—and neither reason nor authority is suggested why this agreement is not legal and binding upon the parties thereto, and upon the property impressed with that lien. This agreement could have been acknowledged and recorded and made notice to all persons dealing with that property. It is evident that the stockholders of the Pioneer Mining Company did not wish to subject themselves to the possible personal liability of paying the whole purchase price of the mine, should it prove to be of little or no value. And this security was still acceptable to Baker, and by him accepted in Contract A. This arrangement was manifestly intended to give each party an opportunity of getting out of the mine the large amount of money which they respectively had invested in it; giving Baker the preference, and to Chapman and Sayre, or, which is substantially the same thing, the Pioneer Mining Company, the benefit of any surplus, and the mine itself, after the payment of Baker's claim against the mine.

It is urged by defendant that there is no valuable consideration for any of these contracts, and especially for the final contract of December 20, 1878. I cannot agree with counsel in this view. It may not be so important to inquire into the consideration of the contracts preceding the final contract of December 20th, as the others are merged therein. But I think, on examination of all of the contracts, we shall not fail to find them based on good and valuable considerations.

At the date of Contract A the Pioneer Mining Company had suspended work on the mine. Its outlays had been large, the returns small. It was under no obligation to go on forever, spending large sums of money upon the mine, with no returns. Baker held his claim against the mine for $125,000, payable from the proceeds thereof. If the mine could not be made to pay this amount, Baker's only remedy was upon his contract. Hence the Contract A. Baker surrendered his stock in the company, reduced his claim to $100,000, payable as before, and he and the company surrendered all liabilities and obligations held by the one against the other, and the company promised to resume work on the mine. It did so, but probably not as effectively as was expected when the contract was executed. The complaint alleges that the company expended more than $120,000 on the mine after the date of that contract. I am not able, from the testimony, to say what that amount was, but it was many thousands of dollars.

All of this, to a certain extent, inured to Baker's benefit. I cannot think there was lack of valuable consideration from either party in this contract. And this remark applies also to Contract B, and the contract of November 1st, (Defendant's Exhibit 9.) It can hardly be claimed that the contract of December 20, 1878, is without a valuable consideration. Without specifying others, it will be sufficient to observe that it gave Baker continuous possession of the mine for

four years, a thing he greatly desired, and the right to work it as he saw fit; and this has resulted, as he admits in his answer, in a clear profit to him of $47,000 above all expenses. It is true that he has done this by making at times large advances; but this is what he contemplated, and knew he must do, when the contract was made. It has not been any the less valuable to him on this account,—the advances have been repaid,—and it is not denied that Baker has been in possession of this mine all this time under this contract, or certainly since the expiration of the lease of November 1, 1878, for six months. Its want of mutuality is hardly apparent, and would have found little support had Chapman and Sayre attempted to dispossess Baker of the mine without first complying with the terms of that contract. It is only by complying with those terms that plaintiff seeks to establish a right of action in this case. It may be further observed that by this contract Baker was to be paid interest on all of his advances at the rate of 1 per cent. per month. I am not certain, and do not now decide, whether or not, under this contract, this rate of interest is to apply to his judgment of $102,610. If it does, it is an advantage to him of more than $5,000 per annum, as his judgment drew only 7 per cent. per annum.

Baker testifies, in effect, that his understanding is that his judgment draws interest under the contract at the increased rate, and he so computes interest thereon in a partial statement of his account rendered to Sayre, (Plaintiff's Exhibit N.) If, however, this judgment is void, as insisted by defendant's counsel, it, of course, can draw no interest. And the same consideration extends, in a measure, to the agreement of December 16, 1882, extending this contract of December 20, 1878. Possession of the mine was to continue in Baker. This extension was granted for one of two purposes: either to be carried out in good faith by all parties thereto, or it was designed as a trap, a device, by which Chapman and Sayre, or the Pioneer Mining Company, should be induced unwittingly to allow the time for redemption to expire without offering to perform on their or its part. Nothing in the record supports the suggestion that the latter was the purpose of its execution; but were it fully established that such was its purpose, it would receive no countenance from the court; and no laches have arisen thereby, on the part of plaintiff, that would preclude recovery on that ground.

It is asserted and maintained with great earnestness that Baker now holds an absolute, indefeasible title to this mine, by virtue of the sheriff's sales on the judgments mentioned, free and clear of all equities arising from this contract of December 20, 1878; that in procuring such title he acted independently of, at arms-length, and adversely to, Chapman and Sayre, and all parties interested in the Pioneer mine. I must say that this assertion is not supported by a line or word of testimony in the case. The sales were made nearly as outlined in Contract B, and exactly as provided in the contract of Oc-

tober 12, 1878, executed by Baker, Baird, and the California Powder Works. This contract, as I have held, and as *is* abundantly shown by the testimony, was procured mainly by Chapman's influence, effort, and solicitation. His personal investment in the mine was then equal to, or greater than, the amount then due Baker. It is rather a play upon terms than a statement of fact to say that the debt of the Pioneer Mining Company to the California Powder Works was paid by means of these execution sales made by the California Powder Works. Those sales were merely a means to an end. The California Powder Works did not want the mine, and it agreed by this contract of October 12, 1878, to acquire and transfer the title thereto for a specific purpose only. Its demand was not paid until years after it acquired and transferred this title, as I have already shown.

The legal title to the mine passed to Titus about April 29, 1879, and was held by him until September 15, 1882, when he deeded the property to Baker, subject to certain mortgages, and subject to the rights of Chapman and Sayre, as set forth in the complaint. There can be no doubt, under the evidence, as to the perfect understanding and agreement of all of these men—Baker, Chapman, Sayre, and Titus—as to their rights in this property, under these sales, and the contract of December 20th. And there is no disagreement among them on this point. Titus held the title to the property as the trustee of both parties. He testifies that he understood that he had full power to sell the mine, but that he would not have sold it at any price without the consent of Baker and Chapman. Titus had long been the confidential attorney of Baker. He had also been the attorney for Chapman in some matters. Both reposed confidence in him. He drew this contract of December 20th, and the one of November 1st, and had carefully examined and amended Contract B before its execution. He knew all about the contract of October 12th, between Baker and Baird and the California Powder Works, knew its object and purpose, and had joined with Baker in the mortgage to secure Baker's note to the powder works. And he seems to have executed his trust honestly and faithfully. While Titus held this title, he and Baker and Chapman were all trying to effect a sale of the mine. Titus received two or more offers for the mine. These offers he reported to Baker and Chapman for their approval. When requested by Baker and Chapman he transferred the title to Baker, subject to *the conditions mentioned*, and Baker voluntarily so accepted it. His testimony on all of these matters is clear. The title passed to Baker, not as a purchaser, nor by operation of law, but simply at the request of Baker and Chapman to carry out their wishes and purpose in regard to the mine. Baker testifies that he always intended to carry out faithfully the contract of December 20th; that he never sought to avoid it. And his correspondence with Chapman and Sayre from 1878 to 1883, in evidence, is to the same effect. On March 26, 1880, Baker writes to Chapman: "You know how the title

came to be put in Titus' hands. I have made no definite arrangement with him." In the same letter, referring to certain services rendered by Titus in regard to the property, which Baker deemed advantageous, he says: "All of which was of as 'much to your advantage as mine in saving the property. * * * I have repeatedly urged upon you to make a definite arrangement with him, [Titus,] as it belonged more to you than to me to do it, as a certain amount of the proceeds of a sale comes to me and the balance to yourself and Sayre, as Titus fully understands. * * * I leave it between you to settle as you can. I would have held the title myself, if allowed; then all would have been easy." He urges Chapman to accept an offer of $450,000 for the mine, and says, "I leave it in your hands." The following day, March 27th, he again writes Chapman: "With regard to what the Pioneer could be sold for at the very lowest, I can only say the matter rests wholly with you. I have made the last reduction on my claim that I ever shall, and the final contract defines what I am to have out of the property; whatever more is got out of it I freely yield as the contract specifies. * * * You must not forget that your objections and fear to trust me to carry out this programme produced the necessity to put it [the title] in other hands, where we could not control the situation, and therefore, if loss comes from it, you are the one on whom that loss justly falls and not on me." On September 24, 1882, after the title had passed from Titus to himself, Baker writes to Sayre: "I am now able to report that I hold the deed to the property, as contemplated in our original contract of redemption." November 25, 1882, he writes Sayre asking him to join in a bond, executed by himself and Chapman, to sell the mine for $400,000, and says: "If we do not sell this mine I would rather have my money in sight than the mine clear of all incumbrances, with the risks which attend it. Hence I say I will never clear up the mine again without I do it for myself, and at the end of this extension I must have my money or be the sole owner of the mine, untrammeled by any redemption contracts."

There are many letters in evidence from Baker to these parties, and all to the same effect on this matter. His answer alleges that annually, after each clean-up, prior to June 23, 1883, he rendered to Chapman and Sayre a full, true, and correct statement of the amount and value of such clean-up, and of all proceeds and receipts from said mine, and of his disbursements in opening, developing, and working the same. He was under no obligation to do these except by that contract. Every act of Baker, in all this business, from the date of this contract of December 20, 1878, to the twenty-third of June, 1883, shows that he considered the contract to be in full force, and that he did not hold the title to the mine freed from its obligations. And his testimony is to the same effect. I cannot, therefore, give any weight to this assertion, now set up, as to Baker's title to the mine; that he holds it free and clear from the equities arising from the contracts

set forth in the complaint, and especially the contract of December 20, 1878. The assertion is not true, in fact, unless the testimony of every witness on this point is false.

It is further insisted that Baker gave the full market value of this property in the amount for which it was bid in on the execution sales made by the California Powder Works. And this is urged as evidence that the sales were, and were intended to be, absolute, with no resulting trust in favor of Chapman and Sayre, or the Pioneer Mining Company. We have shown, from the testimony, how these sales came to be made. I cannot but think that this inquiry is somewhat irrelevant. But the fact is shown, by every witness examined on this point, that this mine at that time had no market value, in the usual acceptation of that term. It was simply bid in for the amount of those judgments, interest, and costs. Baker testifies that he thinks its fair value at that date was about $25,000 or $30,000. And yet, a day or two thereafter, he bids, on his own execution sale, $60,000 more for the mine, when clearly it had not enhanced $1 in value. This seems inconsistent. The evidence submitted on this point, if it proves anything, proves too much. Some of the witnesses testify that they would not give four bits for the mine, while the aggregate of Baker's bids for it were nearly $90,000. And we are to remember that Baker did not pay the amount for which the mine was struck off on the first execution sales. Chapman paid the first $10,000, which was paid thereon in September, 1881, and the balance was not really paid until it was paid from the clean-up of the mine for the season of 1883, as testified to by Baker. Whatever may have been the opinion of various persons as to the real or speculative value of the mine in October, 1878, it is clear that Baker, and Chapman and Sayre, all considered it to be of great value, far beyond $25,000 or $30,000. In 1880 Baker urges Chapman to consent to a sale of the property at $450,000. In 1882 Baker asks Sayre, by letter, to join with himself and Chapman in a bond to sell the mine for $400,000. While Titus held the title to the mine, from April, 1879, to September, 1882, he, Baker, Chapman, and Sayre were all trying to effect a sale. Titus seems to have had at least two offers for the property: one at about three hundred or three hundred and fifty thousand dollars, and the other at a larger sum. I cannot but think that Baker, Chapman, and Sayre were the best judges of the value of that mine, and their judgment in this respect is best shown by their actions relative to its sale, and the price asked therefor. But in this case it makes no difference if Baker's purchase on the execution sales was at the then full value of the mine; the whole transaction was still in effect only a mortgage. In cases of doubt whether a transaction was a conditional sale or a mortgage, equity will hold it to be a mortgage. By so doing, the rights of each party are preserved; the mortgagor is permitted, upon fulfillment of his contract, to save his property, and the mortgagee receives his just dues, and is entitled to no more.

We pass to the alleged tender made by Chapman, in compliance with this final contract of December 20, 1878. Prior to June, 1883, there had been correspondence between these parties, and especially between Baker and Sayre, in reference to the redemption of the mine, the amount required therefor, etc. About June 19, 1883, Chapman applied to Baker for a further extension of time to redeem under the contract of December 20th. He wished it extended until after the clean-up of the mine for that year. This would give Baker the benefit of that season's products, then supposed to be large, and, as shown by Baker, was in excess of $87,000. This request Baker refused, and he then informed Chapman that redemption must be made by June 22d, or the right to redeem would cease on that date. Baker then thought that the extension of time on this contract of December 20, 1878, made December 16, 1882, expired June 22, instead of July 1, 1883. Chapman then made arrangements by which he was to obtain $100,000, and whatever more might be required, with which to redeem the property. On the twenty-eighth of June, following, Chapman applied to Baker for a statement of his accounts, and to know the amount required for redemption. He had, prior to this, written Baker to have such accounts prepared.

This statement Baker did not and could not furnish. His books were not there, at the mine, when the request was made, and he states in his testimony that he had not made up his accounts since October, 1882. The bills were not in, and expenses not known. It is evident from the testimony, and chiefly that of Baker, that Baker could not have furnished a true or correct statement of his accounts, or the amount justly due him on July 1, 1883, if he had wanted to do so, and it is equally evident that he did not want to do so. He then thought the time for redemption had expired, and, as he states, he "stood upon his legal rights." By his neglect to have his accounts ready he put it out of the power of Chapman and Sayre to comply with the exact terms of the contract. It was not their fault that they did not know what amount to tender Baker on the first of July, 1883, in redemption of the property. Chapman had prepared the means, in good faith, with which to redeem, but Baker could not tell him the amount required. It is true that Chapman did not then have the money with him to make an actual tender of a definite sum, but if he had produced an unlimited sum it would in no way have aided the matter. Neither he nor Baker could tell the amount due the latter. I consider that there was a substantial compliance with the contract in this respect on the part of Chapman and Sayre, as Chapman's purpose was to pay the full amount due Baker under the contract. Baker's refusal to allow redemption was based solely upon the fact, as he understood it, that the time for redemption under the contract of December 20, 1878, and the extension thereof, had then expired. He did not object that no tender of the amount due under the contract had been made. He stood upon his legal rights, independently of

any tender. It may further be observed that, considering this whole transaction as a mortgage, as I do, a tender upon the exact day was not strictly necessary to preserve the right of the parties under that contract. The right of a mortgagee to redeem is not limited to a strict performance on his part upon the very day his mortgage becomes due.

I have thus endeavored to review this case upon its merits, as established by the testimony. It is seldom that a bill, in a contested case, is so fully sustained by the evidence. I am aware that Chapman and Sayre commenced a suit June 29, 1883, on this contract, seeking its enforcement. Whether or not that suit was well or ill advised I am not called upon to say. This, however, is true, under the evidence in this case: that if they had recovered in that suit in their own names, it would have inured to the use and benefit of the Pioneer Mining Company. A recovery therein would not have changed the facts established in this case, nor would it have precluded the Pioneer Mining Company from asserting its rights. It is of little moment to Baker what party, as plaintiff, holds the equity of redemption under that contract of December 20, 1878, since his rights thereunder will be fully protected, and performance decreed and executed, before he will be called upon to convey the property. The court has determined, in this suit, that plaintiff now holds that equity of redemption, and may enforce it against the defendant. Hadley and Brown also commenced a suit upon this contract, in July, 1883, charging fraud in its execution. Both of these suits were dismissed by the parties who brought them, and were never heard upon their merits. They have but little bearing in this case, which is heard upon the issues raised by the pleadings, and must be decided upon the facts established by the testimony, and the law applicable thereto.

I do not deem it necessary to discuss at length the doctrine of mortgages as applied to this case. These contracts were made under the Code of California, and are subject to its provisions. And this court, in carrying the contracts into effect, will be guided by the decisions of the supreme court of California in construing the provisions of the Code applicable thereto. Under the Code of California, and under the generally recognized doctrine of mortgages, this transaction, as a whole, can only be deemed a mortgage. It is of little consequence whether we consider Baker as a mortgagee, in possession by consent, or as a trustee, holding the title to this mine in trust. When the conditions upon which he holds that trust are fully complied with, he may, at any time, be called upon to surrender that trust.

I deeply regret the necessity which compelled the bringing of this suit. It is most unfortunate that these parties, after years of hearty co-operation, constant courage, struggle, and labor, involving great expenditures of money, and at the last moment, when their long-deferred hopes were almost realized, should have come to this painful

and costly disagreement, and so have thwarted their common understanding and enterprise. I cannot but think that it never would have so happened had not Baker become so erroneously impressed with the idea that the extension of the contract of December 20, 1878, expired June 22, instead of July 1, 1883. He testifies, over and over again, that it was always his intention and purpose at all times faithfully to carry out that contract, and his every act done under it confirms his testimony in this respect. I find the following numbered allegations of the complaint, as numbered therein, sustained by the testimony submitted, to-wit: Nos. 1 and following to and including No. 16, with the exception of the last sentence thereof, in the words, "but the mortgage to Messrs. Morgan & Donahue still remains unpaid, and a lien upon the mine." Baker testifies that he has paid this mortgage. Also, Nos. 17 and following to and including No. 22. The allegations in subdivision 23 as to Baker's secretly retorting amalgam, and his insolvency, are not sustained. His possession of the mine and working the same are conceded.

Let a preliminary decree be entered in favor of plaintiff, if desired, in accordance with this opinion, and the case be referred to the standing master in chancery of this court to take an account between the parties and report the same to the court.