**Leslie F. Robison, Plaintiff-Appellant, v. Elizabeth R. Moorefield, Defendant-Appellee.**

**Gen. No. 10,595.**

510

Opinion filed July 3, 1952. Released for publication July 28, 1952.

GALBRAITH & BAYMILLER, and YOUNGE, FREDERICK & RUTHERFORD, all of Peoria, for appellant.

CLYDE R. BIRKETT, of Peoria, for appellee.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Leslie F. Robison, plaintiff-appellant, filed in the circuit court of Peoria county, his suit against his sister, Elizabeth R. Cleary (formerly Moorefield), defendant-appellee. The complaint alleges in substance that while in 1942 the plaintiff made, executed, and delivered to the defendant his warranty deed, absolute in form, wherein he conveyed to the defendant his undivided one-half interest in the Bower-Buick Garage Building in Peoria, Illinois, this deed was in fact a

mortgage and given as security for a debt. The complaint asks the court for an accounting to determine the amount due on the debt, and upon his payment of the same, that the defendant be required to reconvey the premises.

The answer of the defendant denies that the conveyance was in the nature of a mortgage but alleges that it was in fact an absolute sale of the premises. The cause was referred to the master in chancery who after hearing a great volume of testimony and documentary evidence filed his report recommending that the plaintiff was entitled to receive the relief sought in his complaint. Exceptions were filed to this report. No further evidence was heard by the chancellor and after hearing arguments, he sustained the exceptions and dismissed the complaint for want of equity. This appeal follows.

As the rights of the parties must be determined to a great extent from the evidence presented in the record, it becomes necessary to analyze it to determine its weight and credence. The following facts are largely undisputed: prior to March 1, 1938, L. J. Robison, father of the parties, held in trust the legal title of the garage building in question. The trust was created by the grandfather of L. J. Robison for the benefit of the two parties herein, the only children of L. J. Robison. For several years the trustee looked after the management of the garage building, the sole asset of the trust, and from accumulations of profits from the leasing of the building, purchased a 160-acre farm in Tazewell county, Illinois. The trust provided that when the appellee became twenty-five years old, the trustee should convey the garage building to the plaintiff and the defendant. This time having arrived prior to 1938, the trustee conveyed the premises and also the Tazewell farm to the plaintiff and the defendant as tenants in common. Subsequently by mutual agreement the parties divided the farm, the plaintiff taking 80 acres

and the defendant 80 acres by exchange of deeds. On March 24, 1938 the plaintiff gave the defendant a quit-claim deed to the garage building. The defendant procured a mortgage loan on the building, accounted to plaintiff for his part of the proceeds of the loan, and from her share of the proceeds loaned her brother $4,000 which was evidenced by an interest-bearing note for that amount. Contemporaneous with the delivery of the deed the defendant executed an instrument admitting that the conveyance was in the nature of a mortgage and that on payment of the note she would reconvey to her brother his undivided one-half interest in the premises. From 1938 to 1942 the parties divided the rents from the garage equally between them and mutually paid the expenses. There was no question raised that the 1938 transaction was in the nature of a mortgage. Between 1938 and 1942 the parties had many discussions with relation to money, concerning the operation of the building, the division of the rentals, and possible sale of the building. In 1941–42 plaintiff was having serious financial difficulties. He owed his father $3,500, his sister the $4,000 above mentioned, and rather large sums to other creditors.

On January 16, 1942 the defendant and her husband and the plaintiff and his wife entered into a written agreement. The substance of this agreement was that the plaintiff would convey his undivided one-half interest in the garage building by warranty deed to the defendant subject to a mortgage of $22,000, which the grantee, defendant, assumed and agreed to pay; that in consideration thereof the defendant agreed to convey to the plaintiff by warranty deed her 80-acre Tazewell county farm above mentioned subject to a mortgage of $5,450 which the plaintiff agreed to pay. As further consideration for the exchange of property the $4,000 note due the defendant from the plaintiff on which there was a credit of interest of $20 was to be

surrendered and cancelled. The defendant was to pay the plaintiff an additional sum of $8,000 which was to be obtained if possible by an additional mortgage loan on the premises, but if not obtained, the defendant was to have a reasonable time to pay the money. The agreement further contained provisions with reference to when possession of the farm was to be delivered. It also provided that all indebtedness with some exceptions of the plaintiff should be fully paid with the "cash money" which he received. The agreement was signed by the parties and their spouses and was witnessed by L. J. Robison, father of the parties. On the same day pursuant to this agreement the plaintiff made, executed, and delivered to the defendant, his warranty deed conveying plaintiff's interest in the garage building. The deed was in the form of an ordinary statutory warranty deed and was recorded on January 18, 1944. There was affixed to the deed $13.20 in revenue stamps which were cancelled as follows: "1/17/44 —E. R. M." At the same time the deed to the Tazewell county farm was made and delivered and plaintiff's $4,000 note was surrendered to him.

To summarize, the undisputed facts about the consideration involved in the transaction, be it a sale or a mortgage, were as follows: that the Tazewell farm was to be taken at a net value of $14,550; that appellant's note of $4,000 and accrued interest to his sister, executed March 23, 1938, was to be cancelled; that Leslie was to receive an additional sum of $8,000 to be paid in cash or by note. On January 16, 1942 Leslie owed his sister approximately $27,000 which he claims was a loan and was secured by the warranty deed. His sister claims that the amount was in payment on the sale of the garage building which she alleged she took and assumed to pay the first mortgage of $22,000 to the Central National Bank and the general taxes of $1,700 then due, one-half of both being the debt of the

514

plaintiff. Part of the $8,000 balance was liquidated by her delivering to her brother her promissory note at 5% interest for $4,182. This note has been renewed from time to time and the interest paid and there is still due thereon, although the exact amount is in dispute, approximately $500. The balance of the $8,000 was liquidated by the defendant giving to her father on the same day a note for $4,233. This last note was payment of a note due by appellant to his father for $3,500.

The controverted testimony of the witnesses is in substance as follows. Leslie F. Robison testified that he lived in Peoria, Illinois, and was forty years old; that late in 1941 he owed his sister a note of $4,000 and interest and that he owed his father a note of $3,500 which he had owed him since 1938 when he and his sister had an accounting; that he owed various other creditors approximately $4,400; that in 1941–42 only his father was pressing him for payment; that in 1941 he had numerous discussions with his sister with reference to his financial affairs; that he approached his sister about borrowing $3,500 to pay off his father's note; that she told him she would think it over a few days; that later in the year at a subsequent conversation she told him that she had a plan to offer him with reference to liquidating all his obligations. She said "I'll tell you what I'll do. I'll loan you enough money to pay off all your indebtedness. I want you to give me a new deed on your one-half interest in the garage property as security for this loan." He further testified that about January 1, 1942 he and his sister talked in the bedroom of their father who was then ill and he told his father that his sister was going to deed him the Tazewell farm and loan him $8,000 in cash and that he was going to sell the farm and with the cash pay off all his indebtedness; that his father inquired whether he was making absolute sale of the

515

garage property to his sister and that he replied, "No," that he wouldn't think of selling the garage property but "she is making me a loan and I am giving her a new deed as security for that loan."; that his sister then said, "That's not the way I understand it." The father then said in substance that he would not sanction any such arrangement for a sale. Plaintiff said that his sister then replied, "Well, if that's the way it is going to be and you want it in the form of a loan, I'll agree to that if he can pay me back with reasonable interest. Anyway, I don't think he can ever pay me back and I will be able to keep the garage." Plaintiff said that the next conversation they had was January 16, 1942 at the father's home; that his sister told him she had the necessary papers ready and that he and his father read over the agreement and the warranty deed above mentioned; that her father then said that the form of the agreement and deed constituted an outright sale of the garage property and that this was not in accordance with the agreement that she had made in the father's bedroom theretofore; that the father said that he understood that the transaction would be in the form of a loan and "Leslie would have the privilege of repaying this loan and you, Betty, would deed his one-half interest back to him upon the payment of that loan."; that his sister replied, "We did have an agreement. That agreement is still in effect, but I insist that this agreement be signed in this form because I don't want Les to be able to incur any further credit on his garage interest."; that she wanted to protect both of their interests "against execution suit" that some contractor, a party he might become indebted to, could levy on Leslie's interest. He further said that she stated, "I again state before all of you here that I am entering into this agreement, this verbal part of the agreement with a definite promise that upon repayment of this money

516

I will deed back to Les his one-half interest in the garage."; that his father then said in substance that in a family of their kind, their word was as good as a written agreement and that it would be all right for plaintiff to sign the agreement in the present form. This was done. Leslie testified that he made a memorandum to the effect that he owed his sister $14,550 for the Tazewell farm, a $4,000 note that he had owed his sister since 1938, and an additional $8,000 in cash or by note; that his sister said, "You will owe me $11,000 more," one-half of the mortgage on the garage building as "I will probably have paid that off by the time you have repaid me the money." He testified that she then wrote on his memorandum, Plaintiff's Exhibit No. Two, admitted in evidence, "C. N. Bank, $11,000.00"; that she then said, "You were going to cancel this $4,000 note of mine and your dad's note," and then he wrote down "cancel." He further testified that some time prior to their first conversation they had talked about selling the garage building; that he told his sister that he thought they could get $125,000 for it; that she replied that she was not interested in selling at that price. He further testified that all he was interested in at the time of the last transaction was in raising the $3,500 to pay his father; that after 1942 until 1948 he discussed with his sister at various times the operation and maintenance of the garage; that at various times he talked over business matters with Mr. Bower the tenant at the garage building; that Mr. Bower asked him in 1945 if he would talk to his sister about remodeling the building; that in July 1948 he talked with his sister with reference to the money he claimed he had borrowed from her and told her he wanted an accounting as he was ready to pay back the balance due her; that she replied that if he had any such money why didn't he buy other property "instead of retaining my one-half in that property"

and that she would see her lawyer about it; that at various other times she told him she had not been able to see her lawyer but she never denied to him that he had an interest in the building. He further testified that his sister was the dominant party in the dealings and that she was a strong willed person and would tell him what to do and how to do it.

Leslie F. Robison further testified on cross-examination that he did not know whether he told Bower after 1942 that he was a one-half owner; that subsequently to 1942, prior to July 1948, he did not ask his sister for any accounting of the rentals from the garage building; that he did know the terms of the lease about which his sister had told him; that with respect to the January 16, 1942 transaction the understanding was with his sister that he was to repay her the amount due with reasonable interest; that his sister specifically stated a reasonable rate of interest; that there was no definite date fixed as to when he was to repay the money but it was a reasonable length of time; that he didn't sign any notes to his sister at that time; that he had paid nothing on the indebtedness after 1942. Defendant's Exhibit 8, which was prepared by the plaintiff, entitled "Factors to consider as to whether the sale of the garage is advisable" stated: Some reasons for selling the garage building are that the lease might be cancelled by the tenant owing to the war, that it was not best to own property jointly, that the money obtained from the sale could be reinvested, and that the building was saleable.

L. J. Robison, father of the parties, testified on behalf of the plaintiff as follows: that prior to January, 1942 he had many conversations with his children with reference to their financial affairs; that some time early in January 1942 he had a conversation with his children; that his son said, "Sis and I reached an agreement about our financial affairs."; that she had agreed

to advance him the funds to pay off his indebtedness and he said, "I am going to convey to her my undivided one-half interest in the garage property"; that the daughter replied that was the way she understood it. The father said he would never give his approval to this transaction and she replied that "If that's the way you feel about it, I'll agree to permit him to pay back to me the sum of money that I advanced to him with reasonable interest and deed him back his one-half interest in the garage property at the time of repayment"; that she further said that he would never be able to raise the money so she wouldn't worry much about it. He testified that on January 16, 1942 the children came to his home and his daughter had with her the agreement, Plaintiff's Exhibit One, which he and his son read; that he mentioned to them that the agreement showed an absolute sale of the garage property and his son said that they had a verbal understanding in regard to that previously in his bedroom and that it wasn't an absolute sale, and he asked his daughter if that verbal agreement still stood and she said, "Definitely it does." He said that this satisfied him and his daughter and her husband and his son and his wife all signed the agreement and the deed and he signed as a witness to the agreement; that the daughter said she wanted the agreement and the deed in that form so that she would have definite control over the property and that the son could not have indebtedness accrue that would jeopardize the title of the property in the future. He further testified that in July 1948 the daughter talked to him and told him that Les, the plaintiff, had just been over to her house and offered to pay back the money she had advanced him in 1942 and wanted her to deed him his interest in the garage, and his daughter said, "I am never going to deed it back to him." He further testified with reference to the value of the building that in his opinion

the garage building was worth $150,000 on January 16, 1942. He testified that there was no time fixed as to ''how long my son was to have to repay the money.'' He further testified that his daughter was divorced from Moorefield and entered into a post-nuptial agreement settling their property rights and that he read the agreement and signed it as a witness. This agreement, defendant's Exhibit 14, dated April 14, 1948, provided among other things for the disposition of the garage building in event of sale or her death and made no reference to the fact that at that time she only owned one-half interest in the building. The father testified that he thought this agreement only affected her one-half interest in the garage. He further testified on cross-examination that his son was engaged in business at quite an early age; that he took a pre-law course at the University of Illinois and that his daughter went to a business college; that after her divorce she remarried and probably incurred some parental displeasure in her second marriage. He said, ''Our relations with her since her second marriage couldn't be the same because she hasn't been here. She left Peoria and now resides at Salem, Oregon. However, we continued to correspond with her all the time.''

Elizabeth R. Moorefield Cleary testified that her brother's financial difficulties and threats to partition the property were the reasons for obtaining the quit-claim deed from him in 1938; that he had never paid but $20 interest on the $4,000 indebtedness, evidenced by the 1938 note; that it was her brother who first introduced the subject of making a change in the arrangement existing in 1941; that late in 1941 he came to her with the idea of selling the property to an outsider; that he approached her about buying his interest in the property on many occasions; that she told him she could not buy him out because she had no money; that she had never requested her brother

to take a loan to pay his debt to his father; that he made all the overtures leading up to the 1942 transaction; that in 1942 the physical condition of the Peoria garage was fair but financially it wasn't in good condition; that the war had come along and the tenant, Bower, owing to the fact that he could not sell automobiles, had asked a reduction in rent. Her testimony showed that there was no dispute as to the amount of money and property that flowed between the parties as a result of the 1942 transaction. Her testimony coincided with that of her brother as to the consideration involved. She stated that she was in her father's bedroom at the time related by her father and brother and that one of them told him they had come to an agreement that they thought was satisfactory; she stated "at that time and numerous times I told Les that he would be given first consideration to pay his interest back and exceptional consideration. No amount was arrived at nor was any interest arrived at, and no time." In reply to her suggestion that she would be willing to reconvey to her brother his interest in the property, she said that Les said then and numerous times afterward that he never wanted his interest back and that when he had that much money he would invest it for himself and no one else would have anything to say about it. She further stated: "There was no agreement between my brother and me whereby I would advance him any money. I never at any time suggested to my brother that this transaction of 1942 should be treated as a loan by me to him of any money or property." She further testified that the first time she heard he was making such a contention was August 13, 1948 when he came to her and said he wanted his one-half interest in the property back; that in 1941 the garage property was renting for about one-half of what it was in 1950. She testified that she did not agree as to how much he would have to pay if he subsequently re-

purchased one-half interest in the property. On cross-examination she denied that she told her brother that she would let him buy his one-half interest back later.

Joseph T. Bower who has been tenant at the garage since 1934 testified as follows: that the present lease on the building is dated in 1947, is for ten years, and provides for a monthly rental of $1,200; that the lease provides that he have the right to remodel; that he had incurred remodeling expenses of more than $102,000; that defendant has signed all the leases since 1942 and that since 1942 tenant has never had any conversation with Leslie regarding the terms of the lease and did not remember having any conversations to the effect that Leslie claimed to have any interest in the building.

Bernard J. Seiler testified in behalf of the defendant that he was a real estate broker of long experience in Peoria, Illinois, and was familiar with the values of commercial properties in the area of the garage building in question and of the garage building and that in his opinion in 1942 the building was worth $99,500. He further testified that in 1942 the building was adapted to automobile use and that automobiles were not procurable for sale, that the tenant of the garage building had given notice that he wished to cancel his lease because of war conditions, and that these factors entered into the opinion of the witness concerning the value of the building.

The above constitutes a large portion of the material parts of the testimony as disclosed by the abstract of the record.

■ Here it is necessary to determine if the deed, absolute in form, executed on January 16, 1942, was intended to be in the nature of a mortgage or an absolute sale of the premises. The statute provides that every deed conveying real estate which shall appear to have been intended only as security and in the nature of a mortgage, although the deed is absolute in form,

shall be considered as a mortgage. (Ill. Rev. Stat., 1951, ch. 95, par. 13.) [Jones Ill. Stats. Ann. 83.13.] There appears to be little variance in the testimony with reference to the actual money consideration passing between the parties. The net value of the Tazewell farm was $14,550. The amount of the plaintiff's note and interest made in 1938 was $4,893.33. The cash to be paid by the defendant was $8,000. The total of these sums amounted to $27,443.33. The amount of the first mortgage on the garage building to the Central National Bank was $22,000. The amount of the 1941 taxes was $1,700; so if the transaction was a mortgage, the mortgage money or equivalent consideration going to the plaintiff was $27,443.33. The fact that the plaintiff accepted it in the above form is immaterial insofar as the actual consideration involved is concerned. The nature of the transaction, how and when the considerations were to be paid, are all important matters to be considered to determine the true character of the transaction. If the transaction was in fact an absolute sale, then it would appear that the consideration for the sale was the sum of $27,443.33 and the assumption of one-half of the existing mortgage and general taxes on the premises. If it were a debt, this amount was loaned to the plaintiff.

It is urged by the appellee that a great deal of the conversations narrated by the parties and their father were incompetent as a violation of the parol evidence rule. If it were incompetent, it was not considered by the chancellor and should not be considered here. It is well established law in this State that parol evidence is competent to show that a deed absolute in form is in fact in the nature of a mortgage. (*Helbreg v. Schumann,* 150 Ill. 12; *Kulik v. Kapusta,* 303 Ill. 208; *Cassem v. Heustis,* 201 Ill. 208; *Tepper v. Campo,* 398 Ill. 496; *Williams v. Griffith,* 310 Ill. App. 574.)

In the *Campo* case the court says on page 503 of the opinion:

"The rule also is, as this court has consistently held since the decision rendered in Purviance v. Holt, 3 Gilman, 394, that parol evidence may be admitted to show that an absolute deed, whatever may be it covenants, whether of warranty or otherwise, was intended as a mortgage or mere security for the payment of a debt, and the grantor can have relief in equity."

 It appears to us from the record in the instant case that the conversations between the parties and their father were competent. The plaintiff and his father testified as to what the conversations were and without weighing their credence at this time, it would appear that the deed was given as security for a debt and not as an absolute conveyance. What the parties said prior to and at the time of the execution of the deed and what the defendant said thereafter were competent to establish the true nature of the transaction. Appellee urges and admits that as a general rule parol evidence is competent, but claims that *Kelly v. Lehmann,* 297 Ill. 33 and *Brust v. Brust,* 405 Ill. 132, hold that the conversations of the parties under similar factual situations tending to show contemporaneous understanding inconsistent with the terms of an absolute deed are not competent. We have examined these cases and do not believe under the facts that they are authority to vary the rule as above announced. Parol evidence is competent in the instant case not to vary the terms of the written agreement but to establish its true meaning and to carry out the intention of the parties. (*Jost v. Cornelius,* 334 Ill. App. 279.) To hold otherwise would in most instances prevent redemption and would vitiate the provisions of the statute above mentioned permitting a deed, absolute in form, where proper proof is made, to be considered a mortgage.

■ The person who seeks to establish that a deed, absolute in form, is in fact a mortgage must establish this by clear, satisfactory, and convincing evidence. (*Tepper v. Campo,* 398 Ill. 496; *Brust v. Brust,* 405 Ill. 132; *Smith v. Farmers & Merchants Bank of Carlyle,* 329 Ill. App. 347.) In 1938 the appellant had executed and delivered to the appellee a quitclaim deed for the garage building in question, and at the same time the appellee was given a note by the appellant for which the deed was given as security. The note bore interest and had a fixed due date and at the same time appellee executed an instrument whereby it was agreed that the deed was in fact a mortgage. In 1942 at the time of the execution and delivery of the agreement and deed in question the title to the garage building was still in the appellee. This second deed was a warranty deed and the agreement described in detail the terms of the proposed sale which it purported to be. Appellant and his father both testified that the agreement and warranty deed were given because appellee demanded it because the appellant was in financial difficulty and appellee wanted a new deed in order to keep appellant's creditors from attaching liens and levying on his interest in the garage building. It must be remembered that the parties to this suit are both well-educated people and have had considerable business experience, and it seems difficult to understand why, as she already had title to the building, if it were a mortgage, it was necessary to execute the new agreement and the warranty deed. In fact the execution of the warranty deed would be some slight inference of itself that the transaction was a sale, as she already had the title by a quitclaim deed. If other advancements were to be made and the other deed was in fact a mortgage, why was it necessary to make a new conveyance and agreement? All that would have been necessary would be to have

525

a new agreement as to the future advancements. It must also be considered here that the United States entered World War II in December 1941. Some time in December 1941, the plaintiff discussed with his sister the advisability of selling the building, and by defendant's Exhibit 8, admittedly executed by him, he related various reasons why he thought it might be advisable to sell the building. Among them were that Bower, the tenant, could cancel the lease owing to the war and this would impair the rental value of the building; that it would be better for the parties not to own the building jointly; and that the building was saleable. This evidence is at least relevant to show that prior to the 1942 transaction in question he had seriously considered selling the building. It is also strange and unreasonable that the appellant who theretofore had evidenced the obligation to his sister by a note with interest would not have executed an agreement or note evidencing the amount of the loan from his sister in 1942 including the rate of interest and due date of the obligation, if the transaction had been in fact a mortgage. This is especially true in view of the fact that the $4,000 note executed in 1938 was cancelled and surrendered to the appellant in 1942. Under appellant's theory of the transaction, this note which bore interest was cancelled and surrendered and was transplanted by an arrangement whereby it was added to other monies advanced by way of mortgage without any written obligation thereof or rate of interest or time of payment agreed upon. It is also incredible that the appellant had made no interest payments since the 1942 conveyance nor had he prior to 1948 ever asked his sister about the rent she had received from the garage building nor did he take any active part in its management during this time. It is improbable that appellant if he knew, as he testified, the general character of the leases on the building and the rentals there-

from, which had increased tremendously from 1942 to 1948, that he would not ask his sister the status of his account with her during this period. It is true he did testify that he talked to her about it, but the conversation was general in form and there are no specific amounts or details of the conversation mentioned in his testimony. It is also difficult to understand why, if the transaction were a mortgage, the amount he received from the sale of the farm was greatly in excess of his needs at the time he made the alleged mortgage and yet he made no offer to reduce it by payment of any sum to his sister. Another strong circumstance against the appellant's position is that after the transaction in question, he loaned his sister $1,000 in cash and took her note for it with interest. It is true he testified that she said that she wanted to keep this transaction separate from the mortgage transaction, but it appears to us that it would have been reasonable that if she wanted the $1,000 that he would have said, "You can credit this on my indebtedness to you." This note with interest was repaid by the appellee.

To establish that a deed, absolute in form, is a mortgage, the evidence must disclose that it was intended as security for a valid existing indebtedness enforceable by the grantee in an actionate law or by a foreclosure proceedings. (*Spies v. De Mayo,* 396 Ill. 255.) Not only must there be a debt but it must be due upon a definite date or at a time that can be rendered definite. (*Evans v. Berko,* 408 Ill. 438.). In order that the instrument be a mortgage the rights of the parties under it must be reciprocal, the mortgagor being able to redeem from it and the mortgagee to enforce its payment. (*Caraway v. Sly,* 222 Ill. 203; *Fitch v. Miller,* 200 Ill. 170.) Appellant contends that his testimony and that of his father conclusively establish the fact that the transaction was intended as a mortgage. It is true that looking at their testimony alone, it does

establish the fact that the transaction was a mortgage but their testimony as all testimony must be weighed and evaluated along with all the other evidence in the record and the inferences and deductions that can be drawn therefrom. This rule is well stated in *Tepper v. Campo, supra.*

"However, when a party asserts that a deed absolute in form is in fact a mortgage, he assumes the burden of establishing that allegation *by clear, satisfactory and convincing evidence.* Gillock vs. Holdaway, 379 Ill. 467, 41 N. E. 2d 504. *In the absence of such proof the law presumes that a deed is what it purports to be, that is to say, an absolute conveyance.* Gannon vs. Moles, 209 Ill. 180, 70 N. E. 689. The duty, therefore, devolves upon the court in the instant case to consider whether the evidence, as disclosed by the record here, is of such clear, satisfactory and convincing character as to justify this court in holding that the deed from Appellants to Albert R. Freed was taken as a mortgage to secure the repayment of future advances to be made by him to the Appellants. Their testimony was unreasonable and improbable. . . . Appellants stress the fact that their testimony as to the purpose for which the deed was given, and their explanation of the $5000 check, was uncontradicted either by positive testimony or circumstantial evidence. *This Court has repeatedly held that there may be such inherent improbability in the testimony of a witness that neither court nor jury are required to give it any credence, even in the absence of any conflicting or contradictory evidence. . . . The uncontradicted testimony of interested witnesses to an improbable fact does not require acceptance of their testimony.* Courts are not required to believe an unreasonable story even though it is not contradicted, merely because it has been sworn to by a witness."

In *Lasky v. Smith,* 407 Ill. 97, the court said:

"Courts are not required to accept as true testimony which contains such inherent improbability as to impeach itself. . . . Courts may disregard testimony which is discredited by circumstances as well as by statements of the witness himself."

Testimony of the appellant and his father in the instant case in view of the undisputed evidence and circumstances surrounding the transaction are so improbable and so inconsistent with ordinary business usages even as between a brother and a sister that we do not feel that much weight should be given to it. This is especially true where before the appellant can recover he must establish by clear and convincing evidence that the instrument that he executed was in fact what it did not purport to be, a mortgage. The record discloses that the father and the daughter were somewhat estranged and this factor should be considered in determining the credence to be given to his testimony. The chancellor is not compelled nor are we compelled to accept their testimony in view of the undisputed uncontroverting facts surrounding the transaction.

The evidence in the record also discloses without controversy that at the time of the transaction garage properties of like character were depreciated in value. During the war automobile dealers were not permitted to sell cars. The tenant of this building had a right to cancel the lease and in fact after 1941 for several years the rent was substantially decreased. After the war was over in 1946, the rentals were greatly increased. The tenant spent about $100,000 to repair the building which improvements inured to the benefit of the landlord at the expiration of the lease. It was at about this time that the appellant first notified the appellee that he wanted to pay off the alleged mortgage. It appears that he was waiting until there was a large equity in the building before claiming that the

transaction was a mortgage and not a sale. This also is pertinent evidence to be considered by the court to ascertain the true nature of the transaction.

Appellant urges that the purchase price of the building, greatly below its real value, proves that the transaction was a mortgage and not a sale. In 1942 according to the testimony of Bernard J. Seiler, an entirely disinterested witness, whose qualifications were not challenged, the building was worth $99,500. The appellee purchased it on this basis at approximately four-fifths of its then value. Considering that in 1942 the value of garage properties in Peoria due to the war had greatly depreciated in value and their value might further depreciate if the war long continued, it appears to us that the price paid for the property was not so inadequate as to make the sale not bonafide.

After giving the appellant the full benefit of the evidence deduced from the entire record, it appears that at the time of the 1942 transaction at the most she was giving her brother an option to repurchase the property within a reasonable time upon his repayment of the consideration with interest.

Appellee at all times throughout her testimony denied that the transaction was a mortgage. She testified that she told her brother about the time the transaction was completed and at other times that he would be given first consideration to buy his interest back. Neither the exact amount, the interest rate, nor the time of repayment under this option were given. It has been held that an oral agreement giving the plaintiff a mere option to repurchase does not constitute a mortgage and is unenforceable as it is in violation of the statute of frauds. (*Caraway v. Sly*, 222 Ill. 203; *Council v. Bernard*, 319 Ill. 392; *Kimmel v. Bundy*, 302 Ill. 514.) It is apparent to us from the entire record that all appellee ever intended was to give her brother

an option to repurchase within a reasonable time. This option is not enforceable under the law as indicated by the above mentioned cases.

Appellee further contends that the doctrine of laches should in itself prevent recovery. She contends that it is obviously unfair for the plaintiff after the real estate in question had become greatly enhanced in value to now claim that he is mortgagor and entitled to redeem. A recent case, *Steinhauer v. Botsford*, 327 Ill. App. 296, involved a suit to redeem from a deed alleged to have been given as a mortgage. The suit was filed eight years after the execution of the deed. The court said in substance: that it was inequitable to permit the party to wait that long a time to determine whether the property would enhance or depreciate in value and held that laches barred the relief. The doctrine of laches may be invoked after varying lengths of time depending on the facts in the case involved. In *Capper v. Poulsen*, 321 Ill. 480, the court says: "It has always been the policy of equity to discountenance bad faith and neglect." In that case the court held that delay barred redemption by one who claimed that a deed was in fact a mortgage. In the instant case the delay was more than six years and we believe that the application of the doctrine of laches under the circumstances contained in the record should bar plaintiff from the right to redeem.

Appellant urges that the findings of the master in chancery who saw and heard the witnesses testify are entitled to much consideration and that the reviewing court is in just as good a position to judge their credibility as was the chancellor. (*Kosakowski v. Bagdon*, 369 Ill. 252.) This is correct rule of law. Here, except for the demeanor of the witnesses, the chancellor and this court from the record have as equal an opportunity to judge the credibility of the testimony as the master in chancery. The master's findings are

entitled to weight, but the chancellor and the reviewing court have the power to overrule his findings, if he was in error. In accordance with our views of the entire evidence in this record we find that the master was in error and the chancellor was correct in his disposition of the issues. We find this is true notwithstanding the fact that the master could weigh the testimony both from the testimony narrated and the demeanor of the witnesses.

We have considered the other matters alleged to be error in the record not reviewed in this opinion, but do not consider them important in view of our conclusions.

 In conclusion it is our opinion that the deed executed on January 16, 1942, constituted a sale of the garage building to the defendant-appellee and was not in fact given as security for a debt and in the nature of a mortgage. It is unreasonable that parties of mature years with business experience would have understood the transaction to be a mortgage. The oral agreement made by the appellee gave appellant an option to repurchase within a reasonable time. This option is not enforceable under the law and if it were enforceable, appellant did not exercise his right within a reasonable time. The laches of plaintiff-appellant prevent his redemption. The chancellor was correct in dismissing plaintiff-appellant's suit and the decree of the circuit court should be and is affirmed.

*Decree affirmed.*