TOICHI KAWAUCHI AND MATSU KAWAUCHI *v.*
ICHIRO TABATA, MITSUYE TABATA, DAVID
PANG, BETTY PANG, COOKE TRUST COMPANY,
LIMITED, AS EXECUTOR OF THE ESTATE OF
RICHARD KAINUMA, DECEASED, MILDRED
KAINUMA, WILFRED OHTA, OKIMI YAE OHTA,
EDWARD YAMADA, ALBERT YAMADA, VER-
NON NUNOKAWA, CHIYO NUNOKAWA, ISAAC
KAWASAKI, TOKI KAWASAKI, KAZUO MIYA-
MOTO, SEIKO MIYAMOTO, HONG CHONG
CHANG, LORRAINE CHANG, BISHOP TRUST
COMPANY, LIMITED, AS EXECUTOR OF THE
ESTATE OF CLARENCE KUSUNOKI, DE-
CEASED, BISHOP TRUST COMPANY, LIMITED,
AS EXECUTOR OF THE ESTATE OF MEREDITH
KUSUNOKI, DECEASED, AND FIRST NATION-
AL BANK.

No. 4399.

March 30, 1966.

Wirtz, Lewis, Mizuha, JJ., Circuit Judge King in
Place of Cassidy, J., Disqualified, and
Circuit Judge Kitaoka, Assigned
by Reason of Vacancy.

162

Plaintiffs sued to obtain a declaration that a transaction entered into in 1958 was a mortgage securing a usurious loan, and to establish a right of redemption upon payment of the sum of $90,000 received by them in the transaction, less "all moneys paid on the loan." The court held that the transaction was a sale, coupled with a lease back of the premises and an option to repurchase. Judgment was entered for defendants and plaintiffs appealed.

Plaintiffs are husband and wife. Toichi Kawauchi, the husband, hereinafter will be referred to as "plaintiff." When both plaintiffs are referred to they will be designated as "the Kawauchis." Defendants are a group of ten husbands and wives,[1] hereinafter referred to as the "doctors' group," or "defendants," who entered into the transaction in question under the circumstances hereinafter set out. A bank, hereinafter referred to as "the bank," also was named as a defendant but it is not concerned in the questions at issue.

At the time of the transaction, first and second mortgages on plaintiff's property were about to be foreclosed. Plaintiff had not been able to obtain refinancing. He was, as found by the court, "considered a bad credit risk." The sum of $70,000 was required to save the property from foreclosure. The property was appraised by the court-appointed appraiser at $160,000 and the upset price fixed at $150,000. At the public auction there were no bidders at that price, though previously a written offer of $150,000 had been received by the court. The offer was withdrawn when plaintiff obtained time to pursue the possibility of selling a portion of the property in order to save the balance. This possibility did not materialize.

After the abortive public auction another sale was

---

[1] Dr. and Mrs. Kusunoki and Dr. Kainuma, who were part of the group, now deceased, are represented by their executors.

ordered without an upset price. This order was entered on February 18, 1958, and the sale was advertised for March 26, 1958.

Plaintiff, since the latter part of 1957, had been in touch with Mr. Joseph Ahuna, a stockbroker and real estate broker, whom he had approached to help him get a loan on the property. He was trying to raise $90,000, and was willing to repay $120,000, "something to that effect," as testified by Mr. Ahuna. Plaintiff testified he offered a 30% premium, or $27,000, plus 5½% interest on the $117,000.

On one occasion Mr. Ahuna introduced plaintiff at the bank and unsuccessfully tried to help plaintiff get a bank loan. He also inquired whether, if a lender were found with less than the $90,000 required, such lender could go to the bank and borrow the difference. He ascertained that the bank would not lend money to a mortgagee on the strength of a mortgage held by him.

After plaintiff had visited Mr. Ahuna several times and Mr. Ahuna still did not know of anyone interested in making a loan, plaintiff in February 1958 came in with a proposition the nature of which Mr. Ahuna related as follows:

"A. I asked him exactly what he had in mind, and he says, 'If you find someone who would like to buy the property, why I would be willing to sell providing the buyer will allow me to lease the property from him on a sort of a sale and lease-back with an option to repurchase the property at the end of three years,' and I asked him what he would want for a property that size, and he told me about $90,000, and I remember telling him that $90,000 is pretty cheap in view of the fact that he had previously stated that he thought the property was worth anywhere from $400,000 to $600,000.

"Q. When you told him that it was pretty cheap, did he make any reply to that statement?

"A. Well, he told me that since the property was due for foreclosure that he was interested in trying to protect his interest and that he would want to sell it with the lease-back and by-back [*sic*] option, and he agreed that the price of $90,000 was low in relation to his own appraisal of the value of the property, but he stated that because time was short and he needed the money as quickly as possible, he figured that $90,000 would be a very, what you call, an inducing deal for anyone who might be interested in it, and all he wanted was that he be permitted to buy the property back.

"I told him that the appraised value was about $160,000 or $175,000. He says he only is interested in enough money to pay off the mortgage and he was confident he would be able to sell the property in view of the development that was upcoming in the Bishop Estate property where the present Star Supermarket is now, and he told me that with the development of that property and surrounding areas that his property value could be enhanced considerably and, if given the chance to buy it back within three years, he could swing it.

"And he also stated another reason why he was asking for $90,000 instead of much more was he wanted to be sure that the price is not so high that he could not buy it back later on. In other words, he wanted to sell it and yet make the price to suit him. He stated at that time that he wanted to buy it back for about $117,000, I believe, and with the property value much higher he figured it would be easier for him to arrange financing to buy it back, whereas if he asked for a much

higher price it would be difficult to sell and he might not be able to buy it back at a later date."

Sometime after this Dr. Kusunoki called Mr. Ahuna about an investment in stocks, and Mr. Ahuna mentioned plaintiff's proposition as a possible investment. After ascertaining the location of the property, Dr. Kusunoki told Mr. Ahuna "that man must be crazy to want to sell it for $90,000." Mr. Ahuna's testimony continues:

"So I told him the reason and he said if the offer was real, and I said yes. He felt that it was a steal. I felt he knew what he was doing and that his actions were based on a calculated risk, and I told Dr. Kusunoki at that time that this fellow feels he can buy it back, and if he couldn't I told him, 'You will just fall into a pot of gold.'

"On the other hand, if he is able to buy it back, I told him, 'You will have received a fair lease rental on the property with interest, and no doubt you will be making a profit of somewhere of $25,000 to $30,000.' * * *"

The upshot of the matter was that Mr. Ahuna attended a meeting with Dr. Kusunoki and some of his medical associates to explain the proposition. Thereafter, a group of ten was formed, of whom eight put up $5,000, while one put up $4,000 and the tenth $1,000. Mr. Ahuna assisted the group to obtain bank financing for the remaining $45,000. After the bank had tentatively approved the loan to the doctors' group, Mr. Ahuna "having promised Dr. Kusunoki that the deal is as stated" took it upon himself to seek the advice of an attorney he knew[2] as to whether "such a deal was proper." He was advised, as he testified: " 'Yes, there have been many deals like that.' "

---

[2] This was not plaintiff's attorney, Mr. Flynn, hereinafter mentioned.

Mr. Thomas W. Flynn, plaintiff's attorney, drew up the documents to complete the transaction. Mr. Ahuna went with plaintiff to Mr. Flynn's office where, as he testified, they "talked about the deal." Mr. Flynn was the attorney representing plaintiff in the foreclosure proceeding. Mr. Flynn testified that he drew these documents on a request made by "Mr. Ahuna and Mr. Kawauchi both jointly and individually * * *." He further testified: "I had no initiative whatever in this part of the long drawn-out problem of Mr. Kawauchi's mortgage situation, the delinquent mortgage situation."

By the time the transaction had taken shape it was very close to March 26, 1958, the date on which the foreclosure sale was to be held under the supplemental order rescinding the fixing of an upset price. As a temporary measure in order to make funds available to clear the title, the bank made a collateral loan to the doctors' group for two years, secured by the assignment by the doctors' group of a note and mortgage given by the Kawauchis to the doctors' group. This note was in the amount of $117,000, payable over a three-year period in monthly installments of $650, including 5½% interest. However, the amount plaintiff was to receive was $90,000, as agreed throughout.

The note and accompanying mortgage were dated March 24, 1958. On the same day the Kawauchis signed a letter addressed to the doctors' group, reading as follows:

"Reference is made to the negotiations between us, under which you are willing to enter into an agreement with us so as to prevent the foreclosure sale of our property on North School Street in Honolulu, and which requires you to raise certain funds for the complete transaction. Because of the fact that time is so

extremely short, we have had prepared and have delivered to you a mortgage, which mortgage you are assigning to the Bishop National Bank of Hawaii in order to obtain some of the funds required for completion of our transaction. We hereby covenant and agree with you, that this mortgage is a purely temporary arrangement, so that required funds can be raised before the foreclosure deadline, and that the true arrangement or agreement between us will be expressed by the other documents to be prepared hereafter, when time will allow.

"Accordingly, we hereby covenant and agree that we will execute and deliver to you a deed of our North School Street property and improvements, it being understood that you will execute back to us a lease of the premises upon the terms and conditions previously agreed to among all of us, which lease will likewise contain a provision allowing us to buy back the property for the sum of $117,000.00 at any time within three years from the date of such deed and lease."

On March 25, 1958, $70,000 was paid into court in the foreclosure proceeding, the sale was cancelled, and satisfaction of judgment was entered. In conjunction therewith the court held a hearing the transcript of which shows:

"THE COURT: I want the record to show that I received a caller yesterday in regards to this case and he informed me that they were in the process of negotiating with the bank and Mr. Kawauchi. However, they were concerned about the legality of their agreement with Mr. Kawauchi. I informed them that I was not interested in any agreement he might enter, they might enter into with Mr. Kawauchi nor was I interested in any agreement or mortgage they might enter into with the bank.

"The only thing I was concerned about was the payment of these judgments and where Mr. Kawauchi got the money from, under what circumstances he got the money, I was not interested in it at all and I advised them if there is any question to contact Mr. Flynn, counsel for Mr. Kawauchi, and he was representing Mr. Kawauchi in this matter and I presume, he represents Mr. Kawauchi in any other subsequent or ancillary agreement he might have. Whether they have contacted you, I don't know.

"MR. FLYNN: Yes."

On April 1, 1958 the Kawauchis executed a deed of the property, which according to the revenue stamps was for the consideration of $90,000. Thereafter the doctors' group as owners of the property executed a mortgage to the bank for $45,000,[3] the temporary bank loan to the doctors' group was marked "paid," and the March 24, 1958 note and mortgage were returned to plaintiff with the note rubber-stamped "cancelled."

After the payment of $70,000 into court, payment of $20,000 was required to complete the promised sum, and this was paid by the doctors' group over a period of time. Of the money thus received, $4,500 or $4,000[4] was paid by plaintiff to Mr. Ahuna as his fee. It further appears that plaintiff made improvements of the property. By the supplemental judgment incorporating the accounting between the parties it was determined that these improvements came to more than $10,000.

A lease for a term of three years from April 1, 1958 was executed by the doctors' group as lessors, and by

---

[3] Though the bank was named as a defendant, the validity and priority of its mortgage are not contested.

[4] The fee originally was fixed at $4,500, and plaintiff testified he paid that amount. Mr. Ahuna testified that at plaintiff's request he reduced the fee to $4,000.

plaintiff Toichi Kawauchi as lessee, at a monthly rent of $650 payable on the 21st of each month. It contained an option for the lessee to purchase the property at any time before the termination of the lease for $117,000, less a credit to be computed at the rate of $110 for each month's rent paid under the lease.[5] The $650 monthly payments were made, but at the end of the three-year term plaintiff had not raised the contemplated $117,000, though according to his testimony he had received offers of $350,000 and $400,000 for the property.

Through an attorney, plaintiff in July 1961 sought "an extension of the lease dated April 1, 1958 and the period of the option to re-purchase the property covered thereby, to December 31, 1961." The sum of $12,000 was offered for this extension. This request was denied by a letter of August 28, 1961, and at the same time a notice was given of termination of tenancy as of September 30, 1961. This suit was commenced September 29, 1961.

Plaintiff contends that the court erred in failing to make any finding as to the execution of the note and mortgage of March 24, 1958, and that if the court had taken into account these omitted facts, it would have been forced to view the case as one of subsequent release, without consideration, of an existing equity of redemption. We do not so view the case. The letter of March 24, 1958 constituted a promise by plaintiff to replace the note and mortgage with other instruments. The note, mortgage, deed and lease were parts of a single transaction, and the $90,000 was consideration for the whole. Since the note, mortgage, deed and lease were tied together by the letter

---

[5] No point is made of the fact that only Toichi Kawauchi, the husband, was a party to this instrument. The letter of March 24, 1958, addressed to the doctors' group and signed by both husband and wife, stated that it was understood the property would be leased back and the lease would contain a provision allowing "us" to buy back the property. Evidently the husband received the option to repurchase in behalf of his wife as well as himself.

there can be no difficulty in connecting them. *Cf., Oliveira v. Silva,* 18 Haw. 602; *Waterhouse* v. *Capital Inv. Co.,* 44 Haw. 235, 244-45, 353 P.2d 1007. Therefore the case is one of renunciation of the privilege of redemption at the time of making of the loan (if there was a loan). This brings us to plaintiff's alternative argument, based on the case being one of a deed and defeasance executed at the same time. In this type of case, as stated in Jones, *Mortgages,* § 301 (8th ed.):

"When it is once established that the separate instrument is a defeasance,[6] the conveyance assumes the character of a mortgage with the inseparable incident of redemption, which no agreement of the parties, that the estate shall be absolute if the money be not paid at the day fixed, can waive. * * *"

The policy back of this rule is explained in section 302 of the same text as follows:

"The mortgagor is not allowed to renounce beforehand his privilege of redemption. Generally, every one may renounce any privilege or surrender any right he has; but an exception is made in favor of debtors who have mortgaged their property, for the reason that their necessities often drive them to make ruinous concessions in order to raise money. When one borrows money upon the security of his property, he is not allowed by any form of words to preclude himself from redeeming."

These principles prevail in Hawaii. Thus in *Kahau* v. *Booth,* 10 Haw. 332, 334, it is stated: "Once a mortgage always a mortgage, and the mortgagor is allowed to redeem." This states the traditional rule. 4 Pomeroy, *Equity Jurisprudence,* § 1193 (5th ed.).

Since the right of redemption may not be waived, the

---

[6] Whether the separate instrument (here the lease with option to repurchase) was a defeasance, is a point to be considered *infra.*

form of the instruments cannot control the case if in reality the transaction was a mortgage. See Annots., 79 A.L.R. 937; 129 A.L.R. 1435, 1473; 154 A.L.R. 1063. As was said in *Hess* v. *Paulo,* 38 Haw. 279, 286: "* * * [N]either artifice nor form nor superficial declaration of intention will successfully obscure the true nature of the transaction." It is here that the court erred. In finding it to be the intention of all parties[7] that the transaction should constitute a sale subject only to an option to repurchase, the court put undue emphasis on the form of the transaction. We do not doubt that the parties intended the form of words that was used, and intended thereby to cut plaintiff off from all rights unless he exercised his option within the three-year period. But will the court permit this purpose to be accomplished? We must enforce not only the policy against renunciation beforehand of the right of redemption but also the statute against usury.[8] As well explained in *Fiedler* v. *Darrin,* 50 N.Y. 437, 443:

"* * * [O]ne who deliberately and intentionally secures to himself $1,650 at the end of four months, in return for a present advance of $1,500, cannot avoid the consequences of the act by testifying that he did not intend to take usury; that is, that he intended to give the transaction a different name from that which

[7] The court found not only that all parties intended to enter into a sale transaction, *i.e.* a conditional sale, but also that according to plaintiff's own testimony, he understood on March 24, 1958, that he would have three years within which to buy the property back at $117,000, that if he did not so buy back the property he would lose all rights in the property, and that when he signed the deed he would be passing title to the defendants. We proceed on the premise that plaintiff did so understand.

[8] The usury statute is part of Chapter 191, R.L.H. 1955, §§ 191-3 to 6, inclusive. The maximum rate of interest is 1% per month.

In defendants' answer it is averred: "Defendants affirmatively state that Plaintiffs knew that Defendants were unwilling to invest money without a high rate of return, that they were unwilling to enter into a loan transaction because of the law against usury, and that the transaction was intended to be and in fact was a legitimate sale and lease transaction."

the law gives it, and call that a purchase and sale which the law calls a loan of money, secured by mortgage. * * *"

And as stated in *Cannon* v. *Seattle Title Trust Co.,* 142 Wash. 213, 252 Pac. 699, 700:

"* * * Where there has been a sale absolute in form and an option to repurchase given, and the claim of usury is made, the form of the transaction will be disregarded and its substance will control. * * *"

*Accord: Wilcox* v. *Moore,* 354 Mich. 499, 93 N.W.2d 288; *Britz* v. *Kinsvater,* 87 Ariz. 385, 351 P.2d 986, 990; *Milana* v. *Credit Discount Co.,* 27 Cal. 2d 335, 163 P.2d 869, 871-72; *Ferguson* v. *Sutphen,* 8 Ill. 547, 567; *Heytle* v. *Logan,* 1 A.K. Marsh. (8 Ky.) 529; *Monroe* v. *Foster,* 49 Ga. 514, 519; *Ringer* v. *Virgin Timber Co.,* 213 Fed. 1001, 1008 (E.D. Ark.). But see *Stark* v. *Bauer Cooperage Co.,* 3 F.2d 214, 217 (6th Cir.).

A separate instrument (here the lease with option to repurchase) is a defeasance if it grants an absolute right to a reconveyance upon payment, is contemporaneous with the deed, and the two together constitute security for a debt. 1 Jones, *Mortgages,* §§ 294-96 (8th ed.). In conformity with the general rule R.L.H. 1955, § 196-1, provides:

"*Sec. 196-1. Lien of mortgages; priority.* Every transfer of an interest in property, real or personal, made as security for the performance of another act or subject to defeasance upon the payment of an obligation * * * is to be deemed a mortgage * * *."

This statute "is comprehensive in scope and should be liberally construed." *Hess* v. *Paulo, supra,* 38 Haw. 279, 285.

Defendants contend that there can be no debt—hence no mortgage—unless the plaintiff was personally liable for repayment of the money. Under this reasoning plain-

tiff must fail unless defendants could have obtained a personal judgment against him. Some of the writers on the subject afford qualified support for defendants' contention,[9] while others state that the weight of authority is contrary thereto.[10] The court below did not rule that the absence of personal liability was conclusive, but put considerable stress on the fact that: "There is nothing before this court which indicates any right on the part of the Defendants to compel the payment of any sums of money."

In *Hess* v. *Paulo, supra,* 38 Haw. 279, 286-87, it is stated, by quoting from *Guilford-Chester Water Co.* v. *Town of Guilford,* 107 Conn. 519, 141 Atl. 880, that "a test generally accepted as decisive is the mutuality and reciprocity of the remedies of the parties; that is to say, if the grantee enjoys a right, reciprocal to that of the grantor to demand a reconveyance, to compel the latter to pay the consideration named in the stipulation for reconveyance, the transaction is a mortgage, while if he has no such right to compel payment, the transaction is a

---

[9] 4 Pomeroy, *Equity Jurisprudence,* § 1195 (5th ed.), sets out the view that the existence of a liability on the part of the grantor is a "general criterion, * * * which furnishes a sufficient test in the great majority of cases." 1 Jones, *Mortgages,* § 315, at 386 (8th ed.), states that the rights of the parties must be reciprocal, and sec. 316, at 391, states that the debt must be one which is enforceable against the person independent of the security. But sec. 90 at 93 states that it is not necessary that there be any personal security, and the remedy of the mortgagee may be confined to the land alone.

[10] In 1 Lawrence, *Equity Jurisprudence,* § 170, at 219, it is stated that: "By the weight of authority the existence of an independent *in personam* remedy against the mortgagor is not essential, a debt chargeable against property only being in effect simply a debt with limited means of satisfaction or enforcement, though some decisions regard such personal liability as essential." Glenn, *Mortgages,* § 5.4, gives it as the rule that "the security nature of a mortgage is in nowise affected by the fact that the mortgagor has refused to bind himself personally for repayment of the debt," and consistent therewith states in sec. 12 at 60-61 that, though there is a difference of opinion: "The fact that the grantor took back an option merely, which he was not bound to exercise, should not weigh heavily against his contention that a mortgage was really intended, because, as we have seen, a mortgage need not necessarily secure a personal obligation."

conditional sale. * * *' " However, the conclusiveness of this test where personal liability is lacking was not before the court, as there was an outstanding promissory note. The quotation in the opinion continues with recognition of the fact that personal liability is not always regarded as the *"sine qua non"* of a mortgage. It may be regarded simply as "a factor whose existence or nonexistence points strongly to the fact that a conveyance is or is not a mortgage." The source of the quotation is 19 Ruling Case Law 266, where the following appears, following the text quoted:

"* * * Accordingly, in those jurisdictions wherein personal liability is an essential element of a mortgage, want of mutuality is, of course, conclusive that the transaction is a conditional sale. Where a contrary rule prevails, want of mutuality is strongly indicative of a sale, but is not conclusive."

In 36 Am. Jur., *Mortgages,* §§ 58-59 and § 151, which has replaced Ruling Case Law, it is stated that while the existence of an obligation to be secured is essential to a mortgage, and under some authority there must be a personal liability of the mortgagor on such obligation, under other authority "personal liability, express or implied, is not necessarily incident to a mortgage * * *." The latter is stated to be the general view, though the existence or nonexistence of personal liability of the grantor is strongly indicative either that the transaction was or was not a mortgage. See Annots., 17 A.L.R. 714, 717; 129 A.L.R. 1435, 1499.

The following are illustrative of the cases holding that personal liability for the debt secured is not an absolute requisite of a mortgage: *Campbell* v. *Dearborn,* 109 Mass. 130, 144; *Cook* v. *Johnson,* 165 Mass. 245, 43 N.E. 96; *Graham* v. *Stevens,* 34 Vt. 166; *Britz* v. *Kinsvater, supra,* 87 Ariz. 385, 351 P.2d 986, 990; *Welsh* v. *Griffith-Prideaux,*

*Inc.,* 60 N.J. Super. 199, 158 A.2d 529, 535; *Vreeland* v. *Dawson,* 55 N.J. Super. 456, 151 A.2d 62; *Bailey* v. *Poe,* 142 Md. 57, 120 Atl. 242, 248; *Pioneer Gold Mining Co.* v. *Baker,* 23 Fed. 258, 268; *Seieroe* v. *First Nat'l Bank,* 50 Neb. 612, 70 N.W. 220; *Federal Trust Co.* v. *Wolman,* 134 Me. 86, 181 Atl. 815. This rule is lent support in this jurisdiction by cases such as *Campbell* v. *Kamaiopili,* 3 Haw. 477; *Kaikainahaole* v. *Allen,* 14 Haw. 527, *Castle* v. *Smith,* 17 Haw. 32, 35; and *Maile* v. *Carter,* 17 Haw. 49, 52, holding that a mortgage may be foreclosed even though the note which accompanied it is barred by failure to present a claim to the executor of the maker, now deceased. And the use of the word "obligation" in our statute does not necessarily import that personal liability is a requisite. *Schexnailder* v. *Fontenot,* 147 La. 467, 85 So. 207, 210.

Neither in *Hess,* nor in the *Guilford-Chester Water Co.* case there cited, was there any question of usury or of inadequacy of the price figuring in the supposed sale. Where the transaction, if it is a loan, is usurious, the personal liability of the borrower is of no real significance. Under the usury law, R.L.H. 1955, § 191-4, a suit against the borrower personally could produce only the sum advanced, without interest or profit. In this type of case the lender relies on the property for his security, being satisfied that he is protected by its high value in relation to the amount advanced. Thus in *Campbell* v. *Dearborn, supra,* 109 Mass. 130, 144, it is stated:

> "A mortgage may exist without any debt or other personal liability of the mortgagor. If there is a large margin between the debt or sum advanced and the value of the land conveyed, that of itself is an assurance of payment stronger than any promise or bond of a necessitous borrower or debtor. * * *"

And as stated in *Russell* v. *Southard,* 12 How. (53 U.S.) 139, 152 :[11]

> "* * * [T]his circumstance [absence of any promise to repay the money] * * * is not only entirely consistent with the conclusion that a mortgage was intended, but in a case where it was the design of one of the parties to clothe the transaction with the form of a sale, in order to cut off the right of redemption, it is not to be expected that the party would, by taking personal security, effectually defeat his own attempt to avoid the appearance of a loan."

In *Heytle* v. *Logan, supra,* 1 A.K. Marsh. (8 Ky.) 529, 531, a usury case, the court put the matter very well, saying:

> "From the case before us, nothing is more plain, if such contracts are free from the operation of the [usury] statute, than the ease with which the law may be evaded. For it is only so to scale the *interest* with the *value* of the property received, as to induce the re-purchase of the property, in order to save, by the payment of the interest exacted, the greater injury in the loss of the property."

Particularly when a question of usury is involved it would be most unrealistic to lay down any absolute requirement that the borrower must be personally liable in order for the transaction to be a mortgage. The result would be to provide a ready avenue of escape from the requirements of the usury law. The absence of personal liability is a factor indicative of a conditional sale but one which nevertheless may be and in this case is outweighed by other circumstances.

---

[11] In the leading case of *Conway* v. *Alexander,* 7 Cranch (11 U.S.) 218, 237, it was stated that it is "a necessary ingredient in a mortgage, that the mortgagee should have a remedy against the person of the debtor," it being recognized at the same time that such personal obligation may be inferred. However, in the later case of *Russell* v. *Southard, supra,* 12 How. (53 U.S.) 139, 152, the point was regarded as open.

In *Campbell* v. *Dearborn, supra,* the court pointed out that under the foregoing reasoning "inadequacy of price * * * becomes an important element in establishing the character of the transaction." Inadequacy of price is a point much argued by the parties here. It is an accepted principle that the value of the property as compared with the sum paid is an important factor in determining whether the transaction was a sale or a mortgage. *Hess* v. *Paulo, supra,* 38 Haw. 279, 287; *Heytle* v. *Logan, supra,* 1 A.K. Marsh. (8 Ky.) 529, 530; *Sheets* v. *Huben,* 354 Mich. 536, 93 N.W.2d 168, 170; *Osipowicz* v. *Furland,* 218 Wis. 568, 260 N.W. 482; *Beeler* v. *American Trust Co.,* 24 Cal. 2d 1, 147 P.2d 583, 592; *Dickens* v. *Heston,* 53 Idaho 91, 21 P.2d 905; Annots., 90 A.L.R. 953; 89 A.L.R. 2d 1040.

Ordinarily we would be guided by the findings of the court below on a matter such as adequacy or inadequacy of the $90,000 advanced in relation to the value of the property. However, the court in its findings ignored the fact that the parties to the transaction dealt on the basis that $90,000 was "a steal." The figure was deliberately set low by the plaintiff in order that he might be able to "buy it back" and defendants knew it. There were no negotiations for a sale at a fair price, and neither side contemplated or intended that plaintiff was to realize the value of the property in this transaction. It is this which unmistakably marks the transaction as a loan.

In the usual case a court is left to infer from the value of the property whether the parties deemed the price to represent the value. Here there is direct evidence that they did not so regard the matter. This overweighs all other circumstances, including absence of personal liability on the part of plaintiff. When the case is judged against the applicable principles of law there is no room for the conclusion that the transaction was a sale.

The court erred in placing a value of $125,000 on the property on the basis of an appraisal report tucked away in the files of the bank.[12] This appraisal was made for another bank, evidently in connection with efforts of plaintiff to refinance the mortgage under foreclosure. There is no evidence that the parties here involved ever saw it, or if they did that it figured in their negotiations. An employee of the bank, a witness, made "a guess" that it was brought in to the bank by Mr. Ahuna. The bank was taking a mortgage from the doctors' group and it evidently was in that connection that it came into possession of this report. Mr. Ahuna's own opinion was that the property was worth $160,000 to $175,000. This is significant since he was the broker who handled the transaction. He represented to Dr. Kusunoki that he stood to "fall into a pot of gold" if plaintiff couldn't exercise the option. The property also had been appraised by the court-appointed appraiser at $160,000. Though there were no buyers at the auction at the upset price of $150,000, there had been an offer of $150,000 received by the court which fell through only because of plaintiff's unwillingness that the property go at that price. In any event, as we have said, the fact that the parties did not intend the $90,000 to represent the value is established without resort to inferences from the court's own valuation of the property.

---

[12] It was stated on the face of this report that the appraisal was "for mortgage loan purposes." The court below reasoned: "That if the figure of $125,000 is taken as a true appraisal of the property and if Plaintiff were able to arrange a loan, the maximum loan based on 60 per cent of the appraised value would have been $75,000. However, even this loan was not available to him because he was a bad credit risk." This was not sound reasoning. Defendants were not figuring on the possibility of a forced sale, as would a bank. Nor were they figuring on receiving only bank interest. Erroneous results were produced by superimposing the conservative approach of a bank on the transaction between plaintiff and the doctors' group, which embraced short cuts and high profits. Even if the property was worth only $125,000, defendants stood to realize from $46,440 to $58,400 at the end of the three-year period, including the monthly payments during the three years, or from 17.2% to 21.6% per annum on the $90,000 advanced.

It is argued that, in considering the adequacy of the price, plaintiff's option to buy back the property must be taken into consideration. The court below reasoned that "this option and the time that it gave to the Plaintiff had considerable value * * *." Undoubtedly, an option to repurchase would affect the selling price, but it is not possible to approach the matter in that light, because neither the $90,000 nor $117,000 figure was fixed by negotiations seeking to evaluate the property as affected by this provision. The $90,000 represented the amount of money plaintiff required, and the additional $27,000 included in the $117,000 represented the premium he offered to get it.

The court below regarded it as significant that plaintiff received $90,000 when only $70,000 was needed to stop the foreclosure, the court noting that plaintiff received "some money for his own use." Plaintiff, however, was undertaking to make monthly payments of $650 when he had been unable to keep up mortgage payments of $587.50 per month to meet the mortgages under foreclosure. He also had to pay Mr. Ahuna's fee (approximately $4,000). So far as appears, the extra $16,000 was the amount plaintiff deemed that he needed to maintain and improve the property,[13] provide a cushion for monthly payments, and enable plaintiff to carry out his plan, which was to use the three years as a grace period in which to sell the property on the rising market which he expected.

Plaintiff retained possession of the property throughout, at a "rent" which represented $5\frac{1}{2}\%$ interest on $117,000, or $536.25 per month, plus $110 creditable to the $117,000 sum on "repurchase," or a total of $646.25 rounded out to $650 per month. This is easily seen upon

---

[13] As seen, plaintiff made improvements of the property which came to more than $10,000, according to the supplemental judgment incorporating the accounting between the parties.

comparison of the "lease" with the promissory note of March 24, 1958. On this phase of the argument we agree with plaintiff that the note of March 24, 1958[14] and the accompanying mortgage colored the entire transaction, particularly in view of the letter of March 24, 1958 agreeing that the deed and lease with option to repurchase would be given to take the place of the note and mortgage. The court erred in omitting the documents of March 24, 1958 from consideration, and in failing to consider the agreement as a whole.

Plaintiff not only remained in possession of the property but was active in seeking to have it rezoned. This was in October 1958 and again in 1959. Plaintiff endeavored to have the application for rezoning signed by the doctors' group, as was necessary under the then state of the record. Though plaintiff offered to pay the expenses of this application, there was no reply to his request. Mr. Ahuna acted as agent for collections for the doctors' group, and there is no evidence that they took any interest in the property.

We conclude that the true nature of the transaction was a loan, and that the finding to the contrary was "clearly erroneous" and reversible under H.R.C.P., Rule 52(a), for the reasons we have stated.[15] Were we to hold otherwise our usury statute would be emasculated.

At the same time we agree with certain findings of the court below which are purely factual in nature. These findings show that the entire scheme was instigated by plaintiff, who set up the transaction as a sale, and caused

14 It is to be noted that this note was for a three-year loan, the period agreed upon between plaintiff and the doctors' group for winding up the transaction. The bank, however, was making a two-year loan to the doctors' group upon the assignment to the bank of this note and the accompanying mortgage.

15 In view of the conclusions reached, Specifications of Error Nos. 3, 4, 6 and 7 will not be considered. Specifications 1, 2 and 5 have been sustained.

defendants to be approached with that proposition. Defendants were not in the loan business, and would never have considered the transaction except for the manner in which it was presented at plaintiff's instigation. Defendants did not, directly or indirectly, instill the idea that this form of transaction should be used.[16] Mr. Ahuna, as agent of plaintiff in obtaining the money,[17] "promised Dr.

[16] We note that plaintiff testified repeatedly that the matter of the deed to the doctors' group entered the transaction only when it appeared that the doctors' group was short of cash, and that the purpose of the deed was to enable the doctors' group to obtain a loan. This must have been, he said, at the time when Mr. Flynn was consulted about preparing the documents. He was contradicted on this point by Mr. Ahuna who, as has been related, testified that plaintiff came to him with the sell and lease-back proposition and thereafter Mr. Ahuna got Dr. Kusunoki interested in the property. Mr. Ahuna was corroborated by the attorney whom he consulted concerning the propriety of such a deal, by defendants themselves who, it was stipulated, if called to testify would testify that they "at no time intended to make a loan * * *," and by Mr. Flynn who testified, as has been noted, that he drew the documents on request and without taking any initiative in the matter. This portion of Mr. Flynn's testimony was given without objection, and we need not get into the disputed portion of Mr. Flynn's testimony which concerns the explanations of the documents made by Mr. Flynn to plaintiff, to which objection was made on the ground of the attorney-client privilege. Accordingly, we have not considered to what extent the court below relied on the disputed testimony, or the admissibility of that testimony.

On the question of when the proposition of a deed and lease back with option to purchase originated the court was amply justified in finding, as it did, that this was before Dr. Kusunoki came into the picture. In addition to the testimony above set out, the circumstances are to be considered. Plaintiff was well aware that he was considered a bad credit risk. He had applied to numerous brokers for help in getting a loan and had learned that investors wanted a big profit; as he testified, "so I figured myself I must make a good offer before I could get a loan, so when I went to see Mr. Ahuna I offered him 30%." Though plaintiff denied knowledge of any question of legality of a 30% premium, and denied having discussed with Mr. Ahuna the proposition of deeding the property and taking a lease back with an option to repurchase, he testified he did discuss such a matter with a Mr. Matsuo; this, according to his testimony, was a matter of helping Mr. Matsuo's hui to borrow money. The probability is that as plaintiff made his rounds he learned that a straight note and mortgage would not be acceptable in the money market he was trying to reach, and so brought in to Mr. Ahuna the proposition to which Mr. Ahuna testified, which Mr. Ahuna in turn relayed to the doctors' group.

[17] Plaintiff contends Mr. Ahuna was the agent of both parties, but there is no indication that was so during the negotiations for obtaining of the money. See 12 C.J.S., *Brokers*, § 14; 12 Am. Jur. 2d, *Brokers*, § 67. After the deal was concluded Mr. Ahuna represented the doctors' group in collecting the monthly payments but that is not material.

Kusunoki that the deal is as stated," that is, a sale, and took steps to check on the matter, consulting an attorney as has been noted. Since the present suit sounds in equity, there is a question whether plaintiff is in an equitable position in seeking to take advantage of his own actions by redeeming the property for only the principal of $90,000 less all payments made, as sought by the prayer for relief contained in his complaint. *Cf., Gund* v. *Ballard,* 73 Neb. 547, 103 N.W. 309, 317, as explained in *MacRackan* v. *Bank of Columbus,* 164 N.C. 24, 80 S.E. 184, 188. We proceed to the question of the form of relief to be allowed plaintiff, having disposed of all of the specifications of error which, on our view of the case, are material.

Many authorities hold that one seeking equitable relief from a usurious contract must offer to pay[18] the principal with legal interest. Annots., 17 A.L.R. 123; 70 A.L.R. 693; 135 A.L.R. 808; 166 A.L.R. 458; 3 Pomeroy, *Equity Jurisprudence,* § 937, at 719 (5th ed.) ; 1 Bisphan, *Principles of Equity,* § 43 (10th ed.) ; 1 Story, *Equity Jurisprudence,* §§ 424-25 (14th ed.). On the other hand, as the cited annotations show, there is authority that no interest at all need be paid in case of a usurious contract though the borrower comes into equity seeking relief.

According to some of the courts which require an offer

---

[18] While the complaint should set forth an offer to pay in appropriate terms, at this stage of the case we will not hold plaintiff to any exactitude in pleading. The record shows that defendants set forth as their "Third Defense" that "The Complaint fails to state a claim against Defendants upon which relief can be granted," but defendants did not further pursue the contention of insufficiency of plaintiff's pleading. Had they done so, plaintiff might have been granted leave to amend. Under these circumstances we will take a broad view of the averments of the complaint, and will treat the averment that plaintiff seeks the aid of equity to determine the amount remaining due on the loan, as an offer to pay whatever may be required as a condition of equitable relief. While the prayer for relief seeks to redeem the property for only the principal of $90,000 less all payments made, the prayer for relief is not decisive pursuant to H.R.C.P., Rule 54(c).

of interest such offer must be, not at the rate prescribed when none is fixed by the contract (here 6% under R.L.H. 1955, § 191-1), but instead at the maximum legal rate of interest (here 1% per month under R.L.H. 1955, §§ 191-3 and 191-6). *Goodwin Co.* v. *National Discount Corp.*, 5 Wash. 2d 521, 105 P.2d 805; *Waters* v. *Garris,* 188 N.C. 305, 124 S.E. 334, 335; *Burwell* v. *Burgwyn,* 100 N.C. 389, 6 S.E. 409, 410; *Herring* v. *Woodhull,* 29 Ill. 92, 100. However, some require interest at the rate obtaining in the absence of an express contract. *Bolen* v. *Wright,* 89 Neb. 116, 131 N.W. 185, *distinguished in McNish* v. *General Credit Corp.,* 164 Neb. 526, 83 N.W.2d 1, 8.

In *Schnack* v. *Hare,* 11 Haw. 747, 748, under an earlier form of our statute, the court raised the question what rate of interest should be applied but did not decide it, saying:

> "Whether only the excess above the rate authorized to be contracted for is void, and the full rate permitted to be contracted for (then 2½% per month) could be recovered or whether only the rate (then 9%) allowed when there is no express contract in writing could be recovered, it is unnecessary to say, because the plaintiff has waived all interest."

Undoubtedly, an important consideration is whether the contract is void, and to what extent.[19]

In *Carey* v. *Discount Corp.,* 36 Haw. 107, plaintiff sued to recover the portion of the interest paid by him in excess of 1% per month.[20] Although the interest rate did exceed the statutory maximum of 1% per month, it was held that

---

[19] At least one jurisdiction has specifically declined to require more than the rate allowed in the absence of an express contract where under the statute the contract was void. *Moncrief* v. *Palmer,* 44 R.I. 37, 114 Atl. 181. But the same jurisdiction subsequently decided the borrower was under no duty to tender any interest, since the contract was void. *St. Germain* v. *Lapp,* 72 R.I. 42, 48 A.2d 181.

[20] See, as to the theory on which the suit was based, Annot., 59 A.L.R.2d 522.

plaintiff could not recover. The court cited and construed what is now R.L.H. 1955, § 191-4, which provides:

"*Sec. 191-4. Usury not recoverable.* If a greater rate of interest than one per cent per month is contracted for, the contract shall not, by reason thereof, be void. But if in any action on such contract proof is made that a greater rate of interest than one per cent per month has been directly or indirectly contracted for, the plaintiff shall only recover the principal and the defendant shall recover costs. If interest has been paid, judgment shall be for the principal less the amount of interest paid. * * *"

This section, the court said, "defines fully the rights and liabilities of the parties to usurious contracts in suits upon the contract," and it held that in such suits the statute gave the borrower more relief than was available to plaintiff Carey. (36 Haw. at 114.) He having paid was not allowed to recover the excess interest though as a defendant to an action brought upon the contract he could have defended against all the interest. The reason was that under section 191-4 "it is made clear by the language used that it [the legislature] intended to save such a contract from being subject to the general rule that a contract made in violation of a statute is void." (36 Haw. at 125.)

In *Carey,* counsel agreed that the penal provision of the usury statute had no application.[21] The court reserved the question what its decision would have been had the penal provision of the statute been applicable, in view of what is now R.L.H. 1955, § 1-9, declaring that: "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." Plaintiff contends that under section 1-9 the contract is entirely

---

[21] It is to be noted that prior to the amendment made by S.L. 1937, c. 222, the penal provisions of the statute (now R.L.H. 1955, § 191-6) only applied if the rate of interest was more than 2% per month.

void as to interest, but this does not follow. Reconciling section 191-4 of the usury statute above quoted with R.L.H. 1955, § 1-9, as it applies to section 191-6 of the usury statute, which since 1933 has made it a misdemeanor when a person "by any method or device whatsoever, receives *or arranges for the receipt of interest*"[22] at more than 1% per month, we hold that the contract is void with respect to interest in excess of 1% per month. However, the contract is not entirely void as to interest. It is a case in which the prohibitory statute operates on only a portion of the promise. A similar situation arose in *Young* v. *Barker,* 185 Kan. 246, 342 P.2d 150, 159. There, as here, the question was the effect of a provision making it a misdemeanor to contract for interest at a rate exceeding the maximum amount authorized by law. It was held that "it is only the excessive interest or charges which are made illegal, not the contract itself."

*Goo Wan Hoy* v. *McKeague,* 24 Haw. 263, cited by plaintiff as to the effect of section 1-9, is not in point. It was a case of illegal consideration for a note, where the note did not show on its face how much of the consideration was illegal. And neither *Schnack* nor *Carey* supports plaintiff's contention that usurious interest must stand or fall as a whole.

Plaintiff cites, and urges that we follow, *Parchman* v. *McKinney,* 11 Miss. (12 S. & M.) 246, *Spann* v. *Sterns,* 18 Tex. 556, and *Yonack* v. *Emery,* 13 S.W.2d 667 (Tex.), but we deem the statutes there involved not comparable. As a matter of statutory law, only section 191-4 of our

---

[22] *Territory* v. *Peterson,* 23 Haw. 476, 482, was decided when the usury statute attached penal sanctions only in the case of a person who "directly or indirectly receives any interest." The amendments made by S.L. 1933, c. 72, introduced further language. The purpose was, as stated by the Senate Committee on Judiciary, reporting on S.B. 81 (Standing Comm. Rep. 79, S. Jour., Regular Session of 1933, p. 409), that "any arrangement that may be entered into, by any method or device whatsoever, for the receipt of interest, increase or profit in excess of said rate [the rate stated] shall also be deemed criminal usury."

usury statute docks the interest altogether, and that section by its terms applies in an action brought by the lender.

Plaintiff argues that the words "in any action on such contract," as used in section 191-4, are not limited to an action at law, and that section 191-4 is applicable in an equitable action to foreclose a mortgage. Plaintiff then contends that the result should be no different because he brought the action, citing *Spann* v. *Sterns, supra,* 18 Tex. 556, 570-71. But as has been noted the statute there involved was not comparable. Even if plaintiff correctly construes section 191-4 as it applies in an equitable action to foreclose a mortgage, it is clear that this section does not dock the interest in the present situation, but instead provides that neither principal nor interest is void. The question therefore is whether equity will extend the application of section 191-4 so as to allow avoidance of the interest, on equitable principles, in cases where the avoidance of the interest is not provided for by the terms of the statute. It is here that the inequity of plaintiff's position estops him.[23] In addition to the circumstances heretofore noted there are others to be taken into consideration. Plaintiff had sought an extension of time in which to pay to a date some months after the date on which suit was filed. He filed suit without being ready and able to pay, seeking "an opportunity to raise money" to pay the balance of the loan when determined by the court, "failing

---

[23] We will assume that despite the initiative taken by plaintiff in bringing about the transaction the circumstances were not such as to estop plaintiff from defending under the usury statute in a law action or from exercising other rights given him by statute. *Cf., Williams* v. *Reed,* 48 Cal. 2d 57, 307 P.2d 353, 359; *Stock* v. *Meek,* 35 Cal. 2d 809, 221 P.2d 15, 21; *Jue* v. *Bass,* 299 F.2d 374, 378 (9th Cir.) ; *MacRackan* v. *Bank of Columbus, supra,* 164 N.C. 24, 80 S.E. 184; *Perry* v. *Shelby,* 196 Ark. 541, 118 S.W.2d 849; *Massie* v. *Rubin,* 270 F.2d 60, 62 (10th Cir.) ; Annot., 63 A.L.R. 962. The question here is solely as to the equity of plaintiff's position in seeking to extend section 191-4 to a case not within its terms.

which repayment, that the court order a sale of the property upon foreclosure and apportion the proceeds * * *." He had, according to his own testimony, rejected offers which would have enabled him to pay within the agreed time. Plaintiff testified that he refused offers of $350,000 and $400,000 for the property, because "I was asking $475,000 less 5% commission to the broker * * *." Plaintiff was willing to reduce this, but wanted more than the $400,000 offered. He was not ready with the principal, even as computed by him, at the end of the three-year term. He was holding out for his price of over $400,000, intent on making a killing.

We deem it unnecessary to resolve the conflict in the case law of the various states,[24] or to decide what rule is applicable in this jurisdiction in the ordinary case. This is no ordinary case. Proceeding upon the basis that the contract is not void as to all of the interest but is void only as to the interest in excess of 1% per month, and without laying down a rule of general application as to what shall be done in cases not within the terms of section 191-4, we hold that under the circumstances of this case the maxim "he who seeks equity must do equity" requires that the Kawauchis, in order to redeem the property, pay interest in addition to the principal sum of $90,000 at the maximum rate allowed by law, *i.e.,* 1% per month, to the extent that such rate or a higher rate was contracted for, that is, for the period April 1, 1958 through March 31, 1961.

[24] For example, Washington, under a statute which provided, as does ours, that the contract was not void (Rem. Rev. Stat. § 7304, now Rev. Code Wash., § 19.52.030), held that the maximum interest which lawfully could be agreed upon must be paid. *Goodwin Co.* v. *National Discount Corp., supra,* 5 Wash. 2d 521 102 P.2d 805. On the other hand Nebraska under a similar statute required payment of interest at the rate obtaining in the absence of an express contract. *Eisaman* v. *Gallagher,* 24 Neb. 79, 37 N.W. 941; *Bolen* v. *Wright, supra,* 89 Neb. 116, 131 N.W. 185, *distinguished in McNish* v. *General Credit Corp., supra,* 164 Neb. 526, 83 N.W.2d 1, 8.

From and after April 1, 1961, the only provision made was for $650 per month to be paid while plaintiff remained in possession.[25] It was stipulated that of this sum $110 per month was creditable against the $117,000 required for redemption. This credit would apply if the property was redeemed at the $117,000 figure, but our judgment will invalidate more than half of the $27,000 premium included in that figure. The credit provision accordingly is inapplicable. It was not contemplated that such credit would be allowed against the lesser figure. Therefore, $650 per month will be allowed from and after April 1, 1961, for the period plaintiff remained in possession.

We note that there is a dispute as to the period during which plaintiff has remained in possession. This will be for consideration on remand. Plaintiff remained in possession at least until October 8, 1963. For any period during which plaintiff has not been in possession the applicable interest rate will be 6% per annum, pursuant to R.L.H. 1955, § 191-1, there being no contractual rate applicable in such case.

For any period during which defendants have been

---

[25] In a supplemental brief filed upon the court ordering argument and putting certain questions "as to the judgment to be entered in the event the transaction is a loan," defendants while not conceding that the transaction was a loan argued upon that assumption in response to the court's questions and contended:

"* * * [A]ccording to the intention of the parties, Defendants [upon the nonpayment of the $117,000] would have been entitled to the property worth $350,000.00. This value of $350,000.00 is placed as a low value because Plaintiffs were not willing to sell for this price but sought a much higher price for the property.

"By contracting to give up all claims to the subject property if not redeemed prior to March 31, 1961, Plaintiffs intended, upon default, to turn over and pay, in property, a sum far in excess of the principal amount plus 1% per month thereon to the present date, for the sum of $90,000.00 plus interest at 1% per month is considerably less than the sum of $350,000.00."

As we have held, a mortgagor cannot renounce beforehand his privilege of redemption. We do not regard the attempt to do so as a contract for interest in the amount agreed to be forfeited in terms of property value, here the difference between $90,000 and $350,000, according to the figures presented.

in possession, they must be deemed mortgagees in possession, and the net rents received by them must be deemed to have been applied on the loan under the principles generally applicable in that situation. See 36 Am. Jur., *Mortgages,* § 301 *et seq.* There of course will be a further credit against the amount required to be paid by the Kawauchis, for all payments heretofore made to defendants directly, or in the form of payments on the bank's mortgage. All such credits will be applied first to the interest hereinabove required and then to the $90,000 principal amount, in accordance with the general rule. *Cf., City & County* v. *Kam,* 48 Haw. 349, 366, 402 P.2d 683.

The unpaid balance on the bank's mortgage will likewise be a deduction from the amount to be received by defendants. Said mortgage is a valid lien upon the property superior to the rights of either plaintiffs or defendants, as hereinbefore noted. Defendants are entitled to receive from the Kawauchis their promise in writing to assume the bank's mortgage and hold defendants harmless.

We have considered what period of time should be given the Kawauchis in which to redeem and assume the bank's mortgage, also the form of judgment to be entered in the event they do not do so. Plaintiff relies on *Keeline* v. *Clark,* 132 Iowa 360, 106 N.W. 257, 260, but the present case is not the same. Plaintiff is not, any more than the ordinary mortgagor, entitled to the aid of equity in obtaining an extension of time in which to pay.[26] The Kawauchis must see to it that defendants are promptly paid the amount secured by the property, which if not

_____

[26] As seen, plaintiff has not at any time been ready and able to pay even the principal. According to his own testimony, he rejected offers which would have enabled him to pay within the three-year period. During that period he had a clear right to redeem under the option to repurchase, and was not obstructed by the form of the transaction.

paid by them must be paid out of the proceeds of a fore-
closure sale to be held without delay.

One more point requires comment, *i.e.*, the matter of
attorneys' fees. Whether such fees are allowable pursuant
to the bank's mortgage, the lease, or any other contract
in writing, and if so whether the same should be allowed
and the amount thereof, will be for the court below to
determine. Also, in the event of an allowance of such
fees to the bank it will be for the court below to determine
who shall bear the ultimate burden of the fees. These
matters are not determined by this opinion.

Pursuant to the foregoing, the judgment appealed from
is reversed and the case remanded for further proceedings
consistent with this opinion, including but not limited
to (1) determination of the amount to be paid by plaintiff
in order to redeem the property, and (2) entry of an
order which, in addition to setting forth the amount so
determined, shall also provide that, unless such payment
be made and a proper instrument assuming the bank's
mortgage and holding defendants harmless be furnished
within ten days after the entry of such order, an appraisal
shall be made and other proceedings taken looking toward
and culminating in a foreclosure sale. But if such pay-
ment be made and the required instrument furnished
within the time prescribed then the Kawauchis shall be
adjudged the owners of the property as against the
defendants, subject to the rights of the bank.

*R. G. Dodge* (*Heen, Kai & Dodge* of counsel) for
appellants.

*George R. Ariyoshi* (*Russell K. Kono* with him on the
briefs) attorney for 17 individual appellees (members of
the doctors' group) and for the Estate of Richard Kai-
numa, Deceased (also a member of the doctors' group).

*Yasutaka Fukushima,* attorney for the Estate of
Clarence Kusunoki, Deceased, and *O. Vincent Esposito,*

attorney for the Estate of Meredith Kusunoki, Deceased (remaining members of the doctors' group), joined in the briefs but did not argue.

---

DISSENTING OPINION OF WIRTZ, J.

I find myself unable to agree with the conclusion reached by the majority of the court "that the true nature of the transaction was a loan, and that the finding to the contrary was 'clearly erroneous' and reversible under H.R.C.P., Rule 52(a) for the reasons" set forth in the opinion of the court.

By their petition plaintiffs sought to reform the deed and lease with option to repurchase into a mortgage. While such a transaction may be declared to be a security agreement there is a strong presumption that a duly executed, notarized and recorded deed and lease purport to be what they appear to be. Proof negating their obvious nature must be strong, clear and convincing. *Bogk* v. *Gassert,* 149 U.S. 17, 28-29; *Johnson* v. *National Bank of Commerce,* 65 Wash. 261, 118 Pac. 21, 23. *Cf., Wallace* v. *Johnstone,* 129 U.S. 58, 64; *Coyle* v. *Davis,* 116 U.S. 108, 112; *Blue River Sawmills, Ltd.* v. *Gates,* 225 Or. 439, 358 P.2d 239, 243; *Elling* v. *Fine,* 53 Mont. 481, 164 Pac. 891; *Parks* v. *Mulledy,* 49 Idaho 546, 290 Pac. 205, 207; *Sargent* v. *Hamblin,* 57 N.M. 559, 260 P.2d 919, 927; *Robison* v. *Moorefield,* 347 Ill. App. 508, 107 N.E.2d 278, 285. See, *Leong Kau* v. *Monting,* 7 Haw. 415, 416. See generally, 1 Jones, *Mortgages,* §§ 294, 295 and 332 (8th ed. 1928). Where a conveyance is absolute in form with an option to purchase, one asserting that it is a loan must establish that fact by evidence which is clear and convincing, and whether the evidence received

is such is usually a question of fact for the trial court and upon conflicting evidence it is not ordinarily open to review on appeal. *Spataro* v. *Domenico,* 96 Cal. App. 2d 411, 216 P.2d 32 (Dist.Ct.App.).

There is general agreement that in order to determine whether a deed absolute on its face together with an agreement of reconveyance constitute a mortgage or a conditional sale depends entirely on the intention of the parties at the time of the consummation of the contract. *Conway's Executors* v. *Alexander,* 11 U.S. 218; Annot., 79 A.L.R. 937 (1932).

The concern of the majority about usury which affects the result reached is misplaced in putting the cart before the horse unless the true intent of the parties spells out a security transaction. Chief Justice Marshall, in *Conway's Executors* v. *Alexander, supra,* 11 U.S. 218, 236-237, early affirmed the policy of carrying out the true intent of the parties where there is a question whether the transaction entered into was an absolute sale with a right of repurchase or one entered into to secure a loan:

"To deny the power of two individuals, capable of acting for themselves, to make a contract for the purchase and sale of lands defeasible by the payment of money at a future day, or, in other words, to make a sale with a reservation to the vendor of a right to repurchase the same land at a fixed price and at a specified time, would be to transfer to the Court of Chancery, in a considerable degree, the guardianship of adults as well as of infants. Such contracts are certainly not prohibited either by the letter or the policy of the law. * * * But as a conditional sale, if really intended, is valid, the inquiry in every case must be, whether the contract in the specific case is a security for the re-payment of money or an actual sale."

The intent of parties is a question of fact[1] and findings as to the intent of the parties come within the scope of the "clearly erroneous" rule under H.R.C.P., Rule 52(a). *United States* v. *Yellow Cab Co.,* 338 U.S. 338, 341. The "clearly erroneous" rule (H.R.C.P., Rule 52(a)) is not limited to findings based solely on testimony involving the credibility of witnesses but encompasses findings based on all types of evidence including inferences drawn from documents and writings. *United States* v. *U. S. Gypsum Co.,* 333 U.S. 364, 394.

A finding is "clearly erroneous" when the reviewing court in considering the entire record is left with the definite and firm conviction that a mistake has been committed. *Ikeoka* v. *Kong,* 47 Haw. 220, 225, 386 P.2d 855.

In considering factors reflecting the intent of the parties the majority recognizes that the absence of personal liability, while not conclusive, is a factor strongly indicative of a conditional sale. However, greater emphasis is placed on the discrepancy between the value of the property and the purported sales price as pointing to a mortgage. While this price, set by plaintiff for his own convenience and regarded by defendants as "a steal,"[2] may appear inadequate as compared with the value of the property, still this inadequacy of the consideration remained only a factor to be considered in determining the intention of the parties. The majority minimizes the conduct and expressions of the parties which are the best indications of intent; the factors considered being

---

[1] *Hewahewa* v. *Lalakea,* 27 Haw. 544.

[2] It seems difficult to reconcile the designation of this sales price of $90,000 as "a steal" with the fact that there were no bidders for the property at the public sale originally ordered at the upset price of $150,000. By the same token, the repurchase price of $117,000 was equally "a steal."

merely aids to ascertaining intent where the same is unclear.

The note of March 24, 1958, and accompanying mortgage, as explained by the covering letter of March 24, 1958, which the majority say the trial judge erred in not considering, as they "colored the entire transaction," indicate that the mortgage and note was "a purely temporary arrangement" so that foreclosure could be forestalled and that "the true arrangement or agreement between us" was to be evidenced by a deed and lease with option to repurchase.[3] This points to a conditional sale, which the parties were perfectly free to make, rather than a security transaction.

The majority concedes that the testimony of plaintiff Toichi Kawauchi was hardly worthy of credit when he sought to establish that the transaction was instigated by others than himself. It is no wonder then that the testimony of plaintiffs (who were in straitened circumstances simply through their own greed) was not considered worthy of belief by the chancellor on all material matters concerning the nature of the transaction.

The record shows that plaintiff Toichi Kawauchi, with knowledge that he could not secure a loan in view of his general bad reputation as a debtor, intended a sale from the outset. His agent Ahuna understood that he had been specifically instructed to sell the property with a lease containing an option to repurchase and sought legal assistance to properly carry out the instructions given him by his principal. The letter of March 24, 1958, addressed to the defendants and signed by plaintiffs refers to a deed and lease with option to buy back the property as the "true arrangement or agreement between us." Plaintiffs'

---

[3] It should be readily apparent that the original mortgage transaction was only an expeditious manner of securing the immediate financing required to avert the foreclosure sale and this "make-shift" transaction was so recognized by all the parties.

then attorney, who drafted the documents involved, fully explained the nature of the transaction to them as one of conditional sale.

Not only did the plaintiffs intend a conditional sales transaction but their actions subsequent to the consummation of the transaction confirm this intent and are inconsistent with the present claim of ownership. Around October of 1958 plaintiff, Mr. Kawauchi, engaged as his attorney a very prominent and reputable attorney who on his behalf addressed a letter of July 7, 1961 to defendants requesting a six months' extension of the option period, offering to pay the sum of $12,000 for such extension, thus placing a value on the option to repurchase, comparably more than the premium originally set for repurchase. The attorney in question, whose repute in legal circles is well known, could hardly have written such a letter on behalf of his client unless, after ascertaining the true nature of the transaction, he considered it a sale subject only to the option to repurchase. Plaintiff, Mr. Kawauchi, in seeking the advice of eminent counsel before making this declaration of his understanding of the transaction cannot now find solace in ignorance of the law.

Plaintiffs' possession of the property was only natural under its lease as tenants and they recognized the ownership of defendants in their request to have the rezoning application signed by them.

It is not disputed that the defendants throughout considered the transaction to be one of a sale with an option to repurchase embodied in the lease back to the plaintiffs. That the defendants never considered that they were making a loan is understandable as they were not in the loan business and there existed no reason, through relationship, friendship or otherwise to make a loan to one whose credit was bad and who could not obtain financing from any regular loan institution. It is difficult to imagine

that the defendants who are all professional men would want to loan moneys and assume the headache of foreclosure upon default against a person who was even then in default in a foreclosure action.

While the court's allowance of interest on the defendants' investment is a more equitable result than that sought by the plaintiffs, still I do not feel at liberty to use the equitable remedy of reformation to flaunt the clearly expressed intention of the parties to the transaction as one of conditional sale.

Even if the testimony of plaintiffs could be believed that they intended the transaction to be one of security only, it has been held that before a deed absolute on its face can be declared to be a security instrument a court must have found that it was the mutual intent of the parties that the instrument have that effect. *Glasgow* v. *Andrews*, 129 Cal. App. 2d 660, 665, 277 P.2d 400 (Dist. Ct.App.); *Sargent* v. *Hamblin, supra,* 57 N.M. 559, 260 P.2d 919, 926; *Rizo* v. *Macbeth* (Alaska), 398 P.2d 209, 212; *Wehle* v. *Price*, 202 Cal. 394, 260 Pac. 878; *Cousins* v. *Crawford*, 258 Ala. 590, 63 So. 2d 670, 677. The defendants certainly never concurred in any such intent as now conveniently testified to by plaintiffs.

While, had I been the trier of facts, I personally might not have arrived at the conclusion reached by the trial judge in this case, I cannot see my way now to disturb his decision as being "clearly erroneous." Where the evidence can support two diametrically opposed conclusions dependent on credibility, the trial judge's choice between the two permissible views of the weight of the evidence is not "clearly erroneous." *Re Land Title, Wong*, 47 Haw. 472, 391 P.2d 403, 406; *United States* v. *Yellow Cab Co.,* *supra,* 338 U.S. 338, 342; *United States* v. *47 Bottles, More or Less*, 320 F.2d 564, 571 (3rd Cir. 1963); *McSorley's, Inc.* v. *United States*, 323 F.2d 900, 902-903 (10th

Cir. 1963); *Homestake Mining Co.* v. *Mid-Continent Exploration Co.,* 282 F.2d 787, 797 (10th Cir. 1960); *Spencer* v. *Young* (Fla.), 63 So. 2d 334, 335.

Plaintiffs also complain that it was error to admit the testimony of their attorney Thomas Flynn and to rely upon that testimony in deciding adversely to them. While the trial judge did indicate that he had considered this testimony, it cannot be said that he necessarily placed "substantial reliance" on it in resolving the case as it is clear that he considered all the other relevant matters in arriving at his decision.

It is not disputed that an attorney's communications to a client are within the privilege arising from the confidential nature of attorney-client relationship. *Russell* v. *Second Nat. Bank of Patterson,* 136 N.J.L. 270, 55 A.2d 211, 217; *I.E.S. Corp.* v. *Superior Court,* 44 Cal. 2d 559, 564, 283 P.2d 700, 703-704; *Jenkinson* v. *State,* 5 Blackf. 465 (Ind. 1840). However, a client who testifies to part of the confidential communication in question waives the privilege (*Steen* v. *First Nat. Bank,* 298 Fed. 36, 41 (8th Cir. 1924); *United States* v. *Goo,* 10 F.R.D. 332, 335 (D.Haw. 1950); *People* v. *Ottenstror,* 127 Cal. App. 2d 104, 273 P.2d 289, 293 (Dist.Ct.App.); *Leverich* v. *Leverich,* 340 Mich. 133, 137, 64 N.W.2d 567; *Rodriguez* v. *State,* 130 Tex. Cr. 438, 94 S.W. 2d 476, 479), and this is true even if such testimony has been elicited from the witness client on legitimate cross-examination. *Steen* v. *First Nat. Bank, supra,* 298 Fed. 36, 41-42; *Raleigh & C.R. Co.* v. *Jones,* 104 S.C. 332, 88 S.E. 896, 898; *Pinson* v. *Campbell,* 124 Mo. App. 260, 101 S.W. 621.

Here, upon cross-examination, plaintiff Mr. Kawauchi testified without objection as to his conversations with his attorney Mr. Flynn about the deed and lease with repurchase option. He had previously given testimony on direct examination as to what had transpired between Mr.

Flynn and himself with respect to the letter of March 28, 1958, and the drafting thereof. As seen, it was stated in this letter that the mortgage and note was "a purely temporary arrangement" so that foreclosure could be forestalled and that "the true arrangement or agreement" was to be evidenced by a deed and lease with option to repurchase. Plaintiff Mr. Kawauchi has thus waived the privileged nature of these confidential communications.

Plaintiffs also emphasized at the argument their seventh specification of error which was:

> "The trial court committed reversible error in failing to order a new trial on the newly discovered evidence of the general excise tax application, which showed that defendants had not claimed ownership until four and a half years after the transaction, and which exposed the misrepresentations of defendants and their counsel made throughout the pleadings and proceedings below."

Newly discovered evidence is a ground for the granting of a motion for a new trial under H.R.C.P., Rule 59, or for relief from judgment under H.R.C.P., Rule 60. In either case "the movant must have been excusably ignorant of the facts, i.e., the evidence must be such that it was not discoverable by diligent search." 6 Moore, *Federal Practice*, § 59.08[3], at 3785 (2d ed. 1965). In *Greenspahn* v. *Joseph E. Seagram & Sons,* 186 F.2d 616, 619 (2d Cir. 1951), it was held that the condition of "due diligence" is not met if the *"slightest investigation* would have disclosed" the asserted newly discovered evidence to the movant. (Emphasis added.)

An order overruling a motion for a new trial or for relief from judgment for the introduction of newly discovered evidence will not be disturbed except for an abuse of the trial judge's discretion. *Filipino Fed. of America* v. *Cubico,* 46 Haw. 353, 372-373, 380 P.2d 488, 499; *Green-*

*spahn* v. *Joseph E. Seagram & Sons, supra.*

Since the record of all applications for and licenses issued under the general excise tax are preserved and available for public inspection, it is difficult to see where "due diligence" had been exercised in this case so as to constitute an abuse of the trial judge's discretion in overruling the motion made several years after the evidence was available to public scrutiny.

Even if the lack of "due diligence" were overlooked, it is difficult to see how the proffered evidence would have affected the ultimate result reached by the trial judge in the judgment. *Filipino Fed. of America* v. *Cubico, supra.* Nothing about the evidence could compel a contrary result or negative the trial judge's findings of fact in support of his conclusion. *Baruch* v. *Beech Aircraft Corp.,* 172 F.2d 445 (10th Cir. 1949).

As I also do not find any of the remaining errors urged on appeal to be meritorious, I would affirm the judgment entered below.